Helen A. COHEN, Plaintiff-Appellant,

v.

ILLINOIS INSTITUTE OF TECHNOLOGY, an Illinois not-for-profit Corporation et al., Defendants-Appellees.

No. 74–1930.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1975.

Decided Oct. 28, 1975.

Rehearing and Rehearing En Banc Nov. 26, 1975.

Before McALLISTER, Senior Circuit Judge,* and SWYGERT and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

This is the first case in which this circuit has been asked to decide whether the executives of a private university, which allegedly discriminated against women in the appointment, retention and compensation of its faculty, were acting under color of state law within the meaning of 42 U.S.C. § 1983[1] or were participating in a conspiracy prohibited by § 1985(3).[2] The appeal is from an order dismissing a complaint alleging detailed facts which we assume to be true.

For five years, commencing in the fall of 1966, plaintiff served as an Assistant Professor in the Department of Psychology and Education of the Illinois Institute of Technology ("I.I.T."). In March of 1969, and in 1970 and 1971 as well, the head of her department recommended that she be promoted to Associate Professor, a tenured position. Every year this recommendation was denied for no stated reason. Plaintiff alleges that each "denial was in fact based solely on Plaintiff's being a woman."

In March of 1971, defendant Rettaliata, the President of I.I.T., advised Dr. Cohen that she would not be offered a tenured appointment, and therefore the

Gerald Rose, Chicago, Ill., for plaintiff-appellant.

E. Allan Kovar, Chicago, Ill., for defendants-appellees.

* Senior Circuit Judge Thomas F. McAllister of the United States Court of Appeals for the Sixth Circuit is sitting by designation.

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

* * * * * *

"in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

ensuing year would be her last. Unwilling to continue in an untenured status, plaintiff resigned and requested a statement of, reasons for refusing to grant her tenure. The chairman of her department responded that he "frankly did not know," and reiterated his own belief, and that of her faculty colleagues, that plaintiff was indeed entitled to tenure on the basis of her fine record with the Institute. A further request for a statement of reasons appears to have gone unanswered.

In August of 1971, plaintiff filed a complaint with the Department of Health, Education and Welfare. After an investigation, the Regional Civil Rights Director reported that there was reasonable cause to conclude "that Dr. Cohen was discriminated against because of her sex by the Institute when it paid her less than the average salary of similarly situated males," and also cause to believe that she was "terminated in part because of her sex."

■■■ Plaintiff commenced this action against I.I.T., its former President, its Academic Vice President, and the Chairman of its Board of Trustees in May of 1974. She has alleged three alternative theories of recovery, under § 1983, under § 1985(3), and under the equal protection guarantees contained in the Illinois Constitution.[3] Because of the timing of the

alleged discrimination, she has no remedy under either Title VII of the Federal Civil Rights Act of 1964, as amended,[4] or the Illinois Fair Employment Practices Act,[5] although the victim of comparable discrimination occurring today would clearly have a remedy under either of those statutes.

The district court held that Count I of the complaint was insufficient because I.I.T. is not a state institution and the complaint failed to allege state involvement in any of the discriminatory personnel practices; Count II was insufficient both because of the failure to allege state action and also because the alleged determination of policy by I.I.T. and its executives was not a "conspiracy" within the meaning of § 1985(3). Since there was no independent basis for federal jurisdiction of Count III, it was dismissed without consideration of its sufficiency.[6]

I.

■■ As this case comes to us, we must assume that defendants have discriminated against plaintiff solely because she is a female and, further, that there is no rational basis for a classification of faculty members by sex. If the conduct of the defendants is "state action," they have violated Dr. Cohen's constitutionally protected right to the equal protection

3. Ill.Const. art. I, §§ 1, 2, 17, 18 (1970).

4. Title VII of the 1964 Civil Rights Act originally exempted from its coverage

 "an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."
 Pub.L. No. 88–352 § 702, 78 Stat. 255 (1964). See 42 U.S.C. § 2000e–1 (1970). This exemption was deleted, effective March 24, 1972, by § 3 of the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103 (1972). See 42 U.S.C. § 2000e–1 (Supp. II 1972). Each of the challenged I.I.T. actions took place before this effective date; the 1972 amendments have been held not to apply retroactively. Weise v. Syracuse University, 522 F.2d 397, at 410–411 (2d Cir. 1975).
 Nor does Cohen have a private cause of action under Exec. Order No. 11246, 3 C.F.R. 339

(1964–1965 Comp.), as amended by Exec. Order No. 11375, 3 C.F.R. 684 (1966–1970 Comp.), which prohibit sex discrimination by federal contractors. Stevens v. Carey, 483 F.2d 188, 190 (7th Cir. 1973). Thus, while a "Report of the Investigation" issued by the Department of Health, Education and Welfare in January, 1974, may be admissible in evidence, see Fed.R.Evid. 803(8), it cannot give rise to an independent private cause of action.

5. The prohibition in the Illinois Fair Employment Practices Act, Ill.Rev.Stat.1973, ch. 48, §§ 851–867, against sex discrimination did not become effective until August 27, 1971. P.A. 77–1342, § 1. Ill.Rev.Stat.1973, ch. 48, § 853(a). No challenged actions took place after that date.

6. The district court opinion is reported at 384 F.Supp. 202 (N.D.Ill.1974).

of the laws.[7] On the other hand, unless the requisite state involvement has been alleged, the complaint does not state a claim actionable under § 1983. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627.

To support the proposition that defendants acted under color of state law, plaintiff has made detailed allegations which may be considered in four parts: first, by using the word "Illinois" in its name, I.I.T. has, in effect, held itself out as a state instrumentality;[8] second, I.I.T. has received financial and other support from the state;[9] third, I.I.T. is pervasively regulated by the state;[10]

---

[7] The Fourteenth Amendment to the United States Constitution provides, in part:

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."
*See Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225.

For purposes of decision, we refer only to plaintiff's Federal Constitutional claim of a denial of equal protection. We need not separately consider her due process claim because the state action analysis is the same for that claim as for her equal protection claim.

[8] "(b) the Defendant INSTITUTE deliberately selected an institutional name which includes the name of the State of Illinois and was patterned after the names of Institutes of Technology of other states, which Institutes are formally a part of the university systems of those respective states, thereby, upon information and belief, intending to imply, and implying, that the Defendant INSTITUTE is formally a part of the university system of the State of Illinois and under the control thereof; . . . ."

[9] "(h) graduate students in the programs in counseling psychology and in rehabilitation counseling of the Department of Psychology and Education of the Defendant INSTITUTE intern or participate in practica at State of Illinois mental health centers, rehabilitation centers, and similar State agencies, during which internships and practica the students work in, are paid (directly or indirectly) by, and are under direct control of the respective State agencies;

(i) the Defendant INSTITUTE, through its Metropolitan Studies Center, conducts seminars in cooperation with, and utilizing speakers provided by, the State of Illinois and its agencies;

\* \* \* \* \* \*
"(m) the Defendant INSTITUTE administers, subject to the direct control of the State of Illinois, the State Scholarship Program, the State Grant Program, and the State Guaranteed Loan Program;
"(n) the Defendant INSTITUTE solicits the power of eminent domain of the State of Illinois and of various agencies thereof for the acquisition of real property in the environs of said INSTITUTE said real property to be conveyed to said INSTITUTE, the continued acquisition of such property being dependent on the continued relationship between the State and the INSTITUTE."

[10] "(a) Defendant INSTITUTE is organized and exists under the laws of the State of Illinois including Chapter 144, Illinois Revised Statutes, §§ 1–17 and §§ 121–135, which sections, *inter alia,* direct the Superintendent of Public Instruction to: (A) examine all so-called privately-operated colleges, junior colleges and universities in the State prior to authorizing a certificate of approval necessary to operate in the State, to ascertain, *inter alia* (i) that each course of instruction to be offered or given is adequate, suitable, and proper, (ii) that the fees to be charged for the courses of instruction are reasonable, (iii) that an adequate physical plant and adequate facilities are provided, and (iv) that the members of the teaching staff are adequately prepared to fulfill their instructional obligations; (B) revoke such certificate for violation of any of the foregoing conditions; (C) make and adopt such rules as, from time to time, he deems necessary; and (D) revokes such certificate of approval for failure to comply with any of the rules adopted by said Superintendent.

\* \* \* \* \* \*
"(c) the Superintendent of Public Instruction of the State of Illinois has, by rule, delegated the accreditation of the curricula, facilities, and faculties of colleges and universities in the State of Illinois to the North Central Association of Colleges and Secondary Schools, which Association does in fact accredit the Defendant INSTITUTE, such accreditation (or lack thereof) being therefore the approval (or disapproval) of the State of Illinois;
"(d) the Defendant INSTITUTE has made admission into numerous academic programs, including that leading to the Master of Science in Teaching degree, contingent on the student's holding a State of Illinois Teacher's Certificate;
"(e) the State of Illinois, through the Illinois State Teacher Certification Board, approves—and by such approval (or lack thereof) controls—at least twelve undergraduate programs at the Defendant INSTITUTE, including programs in psychology in the

and fourth, it has failed to take affirmative action to prevent I.I.T. from using gender as a criterion for faculty compensation and promotion.[11] The complaint, however, contains no allegation that any State instrumentality has affirmatively supported or expressly approved any discriminatory act or policy, or even had actual knowledge of any such discrimination.

■■■■ The facts that I.I.T. was chartered by the State and includes the word "Illinois" in its title do not lend any sup-

port to the claim that I.I.T. acts under color of state law. Every private corporation, whether profitable or charitable, is chartered by the States; unless the charter contains a special authorization or directive to engage in the challenged conduct, the fact that it is granted by the State is of no significance.[12] The use of the State's name gives rise to an appearance of State involvement in I.I.T.'s activities, but, again, unless the appearance of state support either facilitates the activity in question,[13] or provides evi-

---

Department of Psychology and Education for the training and certification of secondary school teachers; and pursuant to regulations of said Board, the Defendant INSTITUTE has established the quantity and content of courses necessary for such certification;

"(f) the State of Illinois, through the Illinois State Teacher Certification Board, approves—and by such approval (or lack thereof) controls—at least eight programs at the Defendant INSTITUTE leading to a degree of Bachelor of Science in Liberal Arts;

"(g) the State of Illinois and the City of Chicago, a municipality thereof, accredit—and by such accreditation (or lack thereof) control—the undergraduate program in the Department of Psychology and Education for the training and certification of secondary school teachers;

 \* \* \* \* \* \*

"(j) at least one program in the Department of Psychology and Education of the Defendant INSTITUTE is established, and from time to time is altered, to conform to the requirements of psychological internship in the public schools of Illinois and to meet the requirements of the State of Illinois for certification as a school psychologist;

"(k) programs in the College of Liberal Arts of the Defendant INSTITUTE are established, and from time to time are altered, to conform with the entrance requirements of the University of Illinois Graduate Schools of Medicine, Dentistry, Veterinary Medicine, and Law, and with the regulations of the Illinois State Teachers Certification Board;

"(*l*) the Defendant INSTITUTE, through its Center for Educational Development, conducts programs for the State of Illinois certified teachers; . . . ."

11. There is no specific allegation in ·the complaint relating to the State's failure to act, but plaintiff has argued that the omission of any prohibition against sex discrimination in regulations as detailed as those applicable to I.I.T. is tantamount to implied approval.

In addition to the allegations referred to in the text and the immediately preceding foot-

notes, plaintiff has alleged that I.I.T. "through its Center for Educational Development, conducts programs for the State of Illinois certified teachers." Para. 3(1). We do not believe this allegation adds any weight to the state action contention.

12. In *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968), Judge Friendly stated at p. 80:

"To be sure, on a strictly literal basis, whatever Alfred University does is 'under color of' the New York statute incorporating it. But this is also true of every corporation chartered under a special or even a general incorporation statute, and not even those taking the most extreme view of the concept have ever asserted that state action goes that far."

13. Relying on Mr. Justice Brennan's separate opinion in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 211–213, 90 S.Ct. 1598, 26 L.Ed.2d 142, plaintiff argues that a mere appearance of state involvement even without any actual substance, would satisfy § 1983's "under color of" requirement. This is not a fair reading of Mr. Justice Brennan's opinion. As he stated:

"To understand how that language applies to private persons, it is helpful to consider its application to state officials. In other legal usage, the word 'color,' as in 'color of authority,' 'color of law,' 'color of office,' 'color of title,' and 'colorable,' suggests a kind of holding out and means 'appearance, semblance, or simualcrum,' but not necessarily the reality. See H. Black, Law Dictionary 331–332 (rev. 4th ed. 1968). However, as the word appears in § 1983, it covers both actions actually authorized by a State . . . and misuse of state authority in ways not intended by the State . . . . Thus, a public official acting by virtue of his official capacity always acts under color of a state statute or other law, whether or not he overtly relies on that authority to support his action, and whether or not that action violates state law. A private person acts 'under color of' a state statute or other law when he, like the official, in some

dence that the institution is, in fact, a State instrumentality,[14] it is of no relevance. Plaintiff has not alleged that either the charter or the name of I.I.T. has any connection with the school's personnel policies.

■ The State of Illinois provides support for I.I.T. in various ways. The Institute may benefit from the State's eminent domain powers;[15] its students are allowed to use the facilities of various state agencies in certain study programs; its students receive financial support in the form of loan guarantees and scholarships; and, under the State Grant Program, funds are provided directly to the school.[16] At most, however, the funds contributed by the State represent only a small fraction of the cost of educating the students for whom the grants are paid.[17]

■ Two different conclusions may be drawn from the allegations relating to the State's support of I.I.T. First, it is plain that the school is not so heavily dependent on the State as to be considered the equivalent of a public university for all purposes and in all its activities.[18] It would dramatically enlarge the state action concept to conclude that these facts are sufficient to require a complete surrender of a university's private character.[19] On the other hand, it is equally clear that the State's support of I.I.T. is sufficiently significant to require a finding of state action if that support has furthered the specific policies or conduct under attack. Again, however, there is no allegation in the complaint that the various forms of assistance given to I.I.T., or to its students, by the State, have had any impact whatsoever on the ability of Dr. Cohen, or any other member of her sex, to be treated impartially by the administration of the Institute. The State has lent significant support to I.I.T.; it is not, how-

way acts consciously pursuant to some law that gives him aid, comfort, or incentive, . . . or when he acts in conjunction with a state official . . . ."

**14.** The reference to the name of the New York State College of Ceramics in *Powe v. Miles,* 407 F.2d at 82, was to evidence that the college was in fact a state institution; Judge Friendly did not suggest that a mere appearance of authorization would provide a substitute for the actual fact.

**15.** *See Grafton v. Brooklyn Law School,* 478 F.2d 1137, 1141–1142 (2d Cir. 1973); *Furomoto v. Lyman,* 362 F.Supp. 1267, 1278–1279. *But see Racklin v. University of Pennsylvania,* 386 F.Supp. 992, 1001 (E.D.Pa.1974). Of course, state action might well be found to exist if I.I.T. was actually empowered by the state to exercise the power of eminent domain, rather than merely receiving the benefits of the state's use of that power. *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 352–353, 95 S.Ct. 449.

**16.** Ill.Rev.Stat.1973, ch. 144, § 1333.

**17.** The State Grant Program provides for the payment of grants for Illinois residents enrolled in I.I.T. to a maximum extent of $100 or $200 per student.

**18.** In contrast, the financial contributions by the state to the University of Louisville ("substantial financial support"), *Brown v. Strickler,* 422 F.2d 1000, 1001 (6th Cir. 1970); Temple University (up to 54.2% of the school's operating income), *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473, 479 (E.D. Pa.1974); and the University of Pennsylvania (25% of the University's "hard core" budget), *Racklin v. University of Pennsylvania, supra* n. 15, at 996–998, where sufficient state involvement was found, were significantly greater than that which could possibly be proven here. Nor is the extent of the state contributions sufficiently in doubt so as to require a reversal of the dismissal of the complaint, as was the case in *Weise v. Syracuse University,* 522 F.2d 397, at 407 (2d Cir. 1975), and *Braden v. University of Pittsburgh,* 477 F.2d 1, 6 (3rd Cir. 1973).

**19.** Dr. Cohen correctly notes that in *Grafton v. Brooklyn Law School, supra* n. 15, Judge Friendly stated that the $400 per student contributed by the State of New York to the school might be sufficient to demonstrate sufficient state participation if racial discrimination were the challenged private activity. 478 F.2d at 1142. We have no occasion to rule on the "facts and circumstances" surrounding the state involvement calculus in such a case. We simply conclude here that the amounts allegedly paid to I.I.T. by the State of Illinois do not demonstrate, in Judge Friendly's words, that "the wholly state-supported activity is so dominant that the private activity could be deemed to have been swallowed up." *Powe v. Miles, supra* n. 12 at 82.

ever, alleged to have lent any support to any act of discrimination.[20]

The same analysis is applicable to the allegations describing the State's comprehensive regulation of the Institute. The regulation encompasses a wide variety of matters, from physical plant to course content and faculty qualifications. It is settled, however, that the mere existence of detailed regulation of a private entity does not make every act, or even every regulated act, of the private firm, the action of the State.[21] Unless it is alleged that the regulatory agency has encouraged the practice in question, or at least given its affirmative approval to the practice, the fact that a business or an institution is subject to regulation is not of decisive importance.[22]

Plaintiff's extensive allegations describing the State's many controls over I.I.T. need not be separately dicussed; for in none is there any suggestion that the State of Illinois, or any agent or agency of the State, has affirmatively encouraged or approved faculty employment discrimination on the basis of gender.[23]

Finally, we are not persuaded that the omission of any affirmative prohibition against sex discrimination, even against the background of detailed State regulation of the Institute, is tantamount to express State approval of the objectionable policy. The holding of the Supreme Court in *Moose Lodge No. 107 v. Irvis, supra,* requires us to reject such an argument. For it is abundantly clear that the State of Pennsylvania had ample power to revoke the liquor license of Lodge No. 107, and further that the State could not constitutionally endorse the Lodge's discriminatory practices. If a State's mere failure to prohibit could be equated with express approval, the *Moose Lodge* case would have been decided differently.[24]

**20.** *Cf. Doe v. Bellin Memorial Hospital,* 479 F.2d 756, 761 (7th Cir. 1973):

"There is no claim that the state has sought to influence hospital policy respecting abortions, either by direct regulation or by discriminatory application of its powers or its benefits. Insofar as action of the State of Wisconsin or its agents is disclosed by the record, the State has exercised no influence whatsoever on the decision of the defendants which plaintiffs challenge in this litigation."

**21.** *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176–177, 92 S.Ct. 1965, 32 L.Ed.2d 627; *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477.

**22.** *Compare Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, which the Court recently described as a situation "where the regulatory agency had affirmatively approved the practice of the regulated entity after full investigation, . . ." *Moose Lodge No. 107, supra,* 407 U.S. at 175–176, n. 3, 92 S.Ct. at 1973.

**23.** The relevant allegations are quoted in full in notes 9, 10 and 11, *supra.* The three aspects of the State regulation that most directly connect the State of Illinois with the employment-tenure policies of I.I.T. are these. First, plaintiff notes that the Superintendent of Public Instruction is required to examine I.I.T., prior to the issuance of a certificate of approval, to ascertain "That the members of the teaching staff are adequately prepared to fulfill their instructional obligations." Ill.Rev.Stat.1973, ch. 144, § 124(4). To carry out the purposes of the act requiring such an ascertainment, the Superintendent is empowered to adopt rules and regulations. *Id.,* § 134.

Second, plaintiff alleges that the Superintendent, by rule, has delegated the accreditation of curricula, facilities, and faculties of Illinois colleges and universities to the North Central Association of Colleges and Secondary Schools, which has in fact granted accreditation to I.I.T.

Finally, plaintiff notes that, as a precondition to its participation in the State Grant Program discussed above, I.I.T. must "possess and maintain an open policy with respect to race, creed and color as to admission of students, appointment of faculty and employment of staff." Ill.Rev.Stats.1973, ch. 144, § 1333(3).

**24.** We have not overlooked plaintiff's argument that I.I.T., in providing higher educational services, is engaged in a traditionally public function. As plaintiff recognizes, this argument has been routinely rejected by the courts in private college and university cases. *See Blackburn v. Fisk University,* 5 Cir., 443 F.2d 121, 124; *Browns v. Mitchell,* 409 F.2d 593, 596 (10th Cir. 1969); *Powe v. Miles, supra* n. 12, at 80; *Pendrell v. Chatham College,* 370 F.Supp. 494, 497 (W.D.Pa.1974); *Furomoto v. Lyman, supra,* n. 15, at 1277; *Bright v. Isenbarger,* 314 F.Supp. 1382, 1398 (N.D.Ind.1970), aff'd 445 F.2d 412 (7th Cir. 1971); *Grossner v.*

The facts set forth in the complaint do not support the conclusion that defendants acted under color of state law in their discrimination against plaintiff. Nevertheless, plaintiff argues that since she has alleged the necessary ultimate conclusion in the language of the statute, the complaint should not be dismissed before she has completed discovery which may reveal some nexus between the State of Illinois and defendants' wrongful conduct. Her argument is supported by the admonition in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, that dismissal is inappropriate unless it is clear beyond doubt that plaintiff can prove no set of facts in support of his claim that will entitle him to relief, and also by *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975), a faculty sex discrimination case in which the Second Circuit ordered a trial on the state action issue.

▆▆ We agree that plaintiff is entitled to the fullest opportunity to adduce evidence in support of her claim. But she is not entitled to a trial, or even to discovery, merely to find out whether or not there may be a factual basis for a claim which she has not made. Her

complaint omits any allegation of state support or approval of the defendants' discriminatory conduct, and the detailed facts set forth in the complaint, even if wholly true and liberally construed in her favor, do not warrant the conclusion that I.I.T. is a public university. It is clear beyond doubt that the claim which she has alleged does not entitle her to relief.

In the *Weise* case, the plaintiff had alleged that the University received so much public aid, both in the form of grants and in payment for services provided under contract, that Syracuse University was dependent on such support for its continued operation. There are no comparable allegations in Dr. Cohen's complaint.[25] We need not decide whether we would have ordered a trial of the *Weise* complaint, but we are satisfied that Count I of the pleading before us does not state a claim for relief under 42 U.S.C. § 1983.

## II.

Count II of the complaint alleges that the individual defendants, perhaps in concert with other unknown individuals, conspired to have I.I.T. adopt policies or

*Trustees of Columbia University,* 287 F.Supp. 535, 549 (S.D.N.Y.1968); *Contra, Belk v. Chancellor of Washington University,* 336 F.Supp. 45, 49 (E.D.Mo.1970).

Dr. Cohen argues, however, that the State of Illinois has declared higher education to be a public function in the preamble of the Educational Facilities Authority Act adopted in 1969, wherein it is stated that "it is essential that this and future generations of youth be given the fullest opportunity to learn and to develop their intellectual and mental capacities and skills . . . ." We disagree; as Judge Friendly stated in response to a similar argument concerning Alfred University in *Powe v. Miles, supra,* at 80:

"Education has never been a state monopoly in this country, even at the primary or secondary levels, and New York's entry into higher education on a significant scale came more than a century after Alfred's establishment."

Illinois' recent declaration of the importance of higher education can scarcely convert I.I.T.'s activities into "powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 352, 95 S.Ct. at 454.

There is, of course no suggestion that I.I.T. has replaced a former public institution which was closed in order to enable its private successor to continue a forbidden discriminatory policy. *Cf. Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256.

25. It should also be noted that in the *Weise* case the affidavit submitted by the defendants indicated that State funds constituted only 3.6% of the school's annual budget. The Second Circuit opinion indicated that if no more financial support was involved, there would be little question about the result. However, the defendants' affidavit had been controverted by the plaintiff sufficiently to raise an issue of fact requiring trial. Moreover, the *Weise* complaint alleged that federal funds had been supplied on condition that the school adopt an affirmative action hiring program designed to increase minority and female faculty representation. There was thus a greater likelihood that an evidentiary hearing would disclose state activity in the hiring area directly connected with the activity in dispute. There are no comparable allegations in the complaint before us.

practices having the effect of discriminating against women holding faculty appointments from I.I.T., and thereby to deprive them of their Fourteenth Amendment right to the equal protection of the laws. Count II is predicated on § 1985(3), which proscribes private conspiracies to deprive a person of a constitutionally protected right.

 Quite properly, Count II omits any allegation that the individual defendants acted under color of state law. For there is no statutory requirement of State participation or support for the conduct of the individual conspirators proscribed by § 1985(3).[26] There is, however, a requirement that the conspiracy deprive the plaintiff of a federally protected right. That requirement would be satisfied if I.I.T. were a State university,[27] or if the constitutional right of the plaintiff at stake were one that is entitled to protection against anyone, rather than merely protection from impairment by a state.[28]

The constitutional rights which were vindicated by the Supreme Court's decision in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338, were not mere prohibitions against objectionable state action. That case held that a private conspiracy to deprive the plaintiffs of their Thirteenth Amendment rights, or their right of interstate travel, was actionable under § 1985(3). Neither

of those constitutional rights is merely a limitation on state power.

Thus, the Court reminded us that the Thirteenth Amendment " 'is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.' *Civil Rights Cases,* 109 U.S. 3, 20 [3 S.Ct. 18, 28, 27 L.Ed. 835]. See also *id.,* at 23 [3 S.Ct. 18 at 30]; *Clyatt v. United States,* 197 U.S. 207, 216, 218 [25 S.Ct. 429, 430, 431, 49 L.Ed. 726]; *Jones v. Alfred H. Mayer Co.,* 392 U.S., at 437–440 [88 S.Ct. 2186 at 2202–2204, 20 L.Ed.2d 1189]." 403 U.S. at 105, 91 S.Ct. 1790. And the Court also emphasized "that the right of interstate travel is . . . assertable against private as well as governmental interference. *Shapiro v. Thompson,* 394 U.S. 618, 629–631 [89 S.Ct. 1322, 1328–1330, 22 L.Ed.2d 600]; *id.,* at 642–644, [89 S.Ct. 1322 at 1335–1336] (concurring opinion); *United States v. Guest,* 383 U.S. 745, 757–760 and n. 17 [86 S.Ct. 1170, 1177–1180, 16 L.Ed.2d 239]; . . . ." 403 U.S. at 105–106, 91 S.Ct. at 1800.

On the other hand, it is equally well settled that the Fourteenth Amendment is not a protection against purely private interference and may be violated only by the action of a state. *See, e. g., Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161.[29] For that reason, we

---

**26.** *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338; *Dombrowski v. Dowling,* 459 F.2d 190, 194 (7th Cir: 1972).

**27.** It is clear that a private conspiracy to cause the plaintiff to receive unequal treatment from the State, or from a State agency, would violate § 1985(3). *Cf. United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239. As we have previously pointed out, it is a fair distillation of the four opinions filed in *Guest* to state

"that, although there was disagreement within the Court on the question whether defendants' private conduct would have been proscribed if there had been no cooperative action by state officers, all members of the Court recognized the need for state involvement in the provision of facilities to which the victims of the conspiracy were denied equal access. In short, the right se-

cured by the Equal Protection clause of the Fourteenth Amendment is a right to protection against unequal treatment by a state." *Dombrowski v. Dowling,* 459 F.2d at 196. (Footnote omitted.)

**28.** As Judge Craven pointed out in *Bellamy v. Mason's Stores, Inc. (Richmond),* 4 Cir., 508 F.2d 504, 507, ". . . there are no Equal Protection Clause rights against wholly private action."

**29.** "Since the decision of this Court in the *Civil Rights Cases, 1883,* 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835], the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however dis-

have held that a private conspiracy to make a completely irrational discrimination between criminal lawyers and other prospective tenants of office space was not covered by § 1985(3). *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972). The rationale of *Dombrowski* is controlling here.

 We recognize, as plaintiff argues, that there is language in *Griffin* which may indicate that the statute will be construed to cover any invidiously discriminatory private conspiracy,[30] and that other circuits, without careful consideration of the issue, have stated that state action is never an element of a § 1985(3) claim.[31] We are satisfied, however, that the distinction between the two kinds of state involvement that may be relevant in civil rights litigation— first, whether the defendant has acted under color of state law, and, second, whether plaintiff's federal right is merely assertable against the State [32]—requires consideration of the state action issue in cases bottomed on an alleged violation of the Fourteenth Amendment.

 We have no doubt that discrimination which is invidious because of racial motivation would be covered since the protection of the Thirteenth Amendment is not merely against state action. But since the Court in *Griffin* so carefully refrained from holding that any discrimination which would be actionable if practiced by the State is for that reason also actionable under § 1985(3), we remain convinced that our reasoning in *Dombrowski* is a correct explanation of why the statute does not broadly "apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798.[33]

criminatory or wrongful.12" (Footnote omitted.)

**30.** Plaintiff relies primarily on a passage in *Griffin v. Breckenridge, supra,* 403 U.S. at 102, 91 S.Ct. at 1798, where the Court stated:

"The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, quoted, *supra,* at 1797. The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.9 " (Footnote omitted.)

In note 9 the Court said:

"We need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us. Cf. Cong. Globe, 42d Cong., 1st Sess., 567 (1871) (remarks of Sen. Edmunds)."

Plaintiff would read this language from *Griffin* as establishing that any private conspiracy to deny a person equal treatment because of some "class-based invidiously discriminatory animus" is actionable under § 1985(3). This interpretation overlooks, however, the fact that the Court, in this passage, was concerned solely with the motivation of the conspirators and not with the right of the complainant that was the subject of the infringement. In the next sentence after n. 9, the Court stated:

"The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all."

**31.** In many cases, *Griffin* is cited for the general proposition that state action is never necessary in a § 1985(3) action. *See, e. g., Weise v. Syracuse University,* 522 F.2d 397, at 408 (2d Cir. 1975); *Richardson v. Miller,* 446 F.2d 1247, 1249 (3rd Cir. 1971).

**32.** In *Dombrowski* we commented on this distinction at some length, stating, in part:

"Although the point is sometimes obscured or overlooked, § 1983 contains two quite distinct 'state involvement' requirements. The first is clearly stated in the statute: the defendants must have acted 'under color of' state law.7 The second inheres in the nature of plaintiff's protected rights: he may not be deprived 'of any rights, privileges, or immunities secured by the Constitution and laws.'8 His Fourteenth Amendment right to protection against discrimination extends only to cases in which state action is involved.9 " 459 F.2d at 194.

The footnotes quoting extensively from Mr. Justice Brennan's opinion in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 188–190, 90 S.Ct. 1598, 26 L.Ed.2d 142, are omitted.

**33.** We have not been faced with the question whether the *Dombrowski* rationale would apply to a right protected by the First Amend-

Because of this conclusion as to the scope of the rights protected by § 1985(3), we do not reach the issue whether a determination of policy by an institute and its executives can be a "conspiracy" within the meaning of this section.

## III.

Since we have held that plaintiff's federal claims were properly dismissed, it was also proper for the district court to refuse to exercise pendent jurisdiction over the State claim.

Affirmed.

## ORDER

The quality of the petition for rehearing merits a brief additional comment.

*Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723, did not involve the question whether action taken by a school, or by school officials, was under color of state law. That case involved a direct challenge to a state program under which text books were provided to students at state expense. In the case before us the plaintiff has not challenged any of the state programs which provide support to I.I.T. or to its students. *Cf. Lucas v. Wisconsin Electric Power Company,* 466 F.2d 638, 645–647 (7th Cir. 1972).

The analysis in Part II of our opinion assumed for the purpose of decision the Congress has ample power to enact a statute having the coverage urged by petitioner but concluded that § 1985(3) is not such a statute. As explained in footnote 33 of the opinion, the cases cited

ment which in terms is only a protection against State action, but which is often accorded special deference. The Fourth Circuit has, however, held insufficient allegations that a private conspiracy had deprived a person of his rights of association. *Bellamy v. Mason's Stores, Inc.,* 4 Cir., 508 F.2d 504, 506–507 (1974). There is authority to the contrary. In *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971) (en banc), the court held that a private conspiracy to prevent a person from exercising his First Amendment rights is actionable under § 1985(3). 450 F.2d at 1235–1237. Similarly, in *Richardson v. Miller,* 446 F.2d 1247 (3rd Cir. 1971), a district court dismissal of a § 1985(3)

at page 8 of the petition for rehearing do not conflict with our holding.

No member of the panel and no judge in regular active service having requested that a vote be taken on the suggestion for an *en banc* rehearing, and the panel having voted to deny a rehearing, the petition for rehearing is denied.

complaint was reversed; the court held the plaintiff had stated a cause of action when he alleged he had been fired from his employment because of his criticism of his employer's racially discriminatory hiring practices.

Most recently, a Fifth Circuit panel has applied § 1985(3) to a conspiracy claim alleging that defendants had conspired to take plaintiff's life and to dismiss him from his job because of his outspoken support of environmental issues. *Westberry v. Gilman Paper Co.,* 507 F.2d 206 (5th Cir. 1975). The panel opinion in *Westberry* has been withdrawn, however, and, thus, has no precedential value.