James Richard **HARRISON**, Appellant,

v.

**KVAT FOOD MANAGEMENT, INC.;**
**Jack Curtis Smith and A.G.**
**Griffith, Jr., Appellees.**

No. 84–1405.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 7, 1985.

Decided July 2, 1985.

S. Strother Smith, III, Abingdon, Va., for appellant.

Mark M. Lawson, Bristol, Va. (White, Elliott & Bundy, Bristol, Va., on brief), for appellees.

Before WIDENER, HALL and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

James R. Harrison appeals the dismissal of his complaint asserted under 42 U.S.C. § 1985(3) against KVAT Food Management, Inc., and two of its principal officers or employees. The district court dismissed for failure to state a claim upon which relief could be granted. The question we decide is whether a Republican, under the circumstances presented here, is a member of a protected class for purposes of § 1985(3). We find no such protected status, and we affirm.

I

Since the present case was decided on a motion to dismiss, the material allegations of the complaint are taken as admitted. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). The complaint is to be liberally construed in favor of the plaintiff, and should not be dismissed unless it appears that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); see FRCP 8(f).

The following facts were set forth in the complaint. Prior to July 1983, the plaintiff Harrison was employed by the defendant KVAT Food Management (KVAT) as a grocery store manager in Lebanon, Virginia. In early June 1983, Harrison announced his candidacy for the Republican nomination for Commissioner of the Revenue in Russell County, Virginia. On June 11, 1984, Harrison received the nomination.

On June 13th, Harrison informed his supervisor, A.G. Griffith, that he would like to take his vacation in the last two weeks

of October in order to campaign on a full-time basis. Mr. Griffith apparently relayed this request to KVAT's chief officer, Jack C. Smith. On June 16th, Griffith informed Harrison that Smith wanted Harrison to take a leave of absence without pay until after the election.

Harrison refused to take the leave of absence, and on June 27th he was informed by Smith that he had three options: (1) not run for the office; (2) take a leave of absence from his job; or (3) resign from his job. In a letter dated that same day, Harrison informed Smith that he would remain on the job and would tender his resignation if he was elected Commissioner of the Revenue, a full-time position. Soon thereafter, Harrison was terminated from his employment with KVAT.

In his complaint, Harrison alleged that his discharge from KVAT was a result of a conspiracy between Griffith and Smith, defendants in this action, designed to prevent Harrison from running for public office as a Republican, and that such a conspiracy constituted an interference with Harrison's First and Fourteenth Amendment rights of freedom of speech and freedom of association, in violation of 42 U.S.C. § 1985(3). In support of these allegations, Harrison contends that other KVAT employees were permitted to run for local political offices as Democrats, and that his discharge was a direct result of his status as a Republican.

In dismissing Harrison's claim for failure to state a cause of action, the district court relied on the recent Supreme Court decision of *United Brotherhood of Carpenters, etc. (Carpenters) v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), in which the Court held that "an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state," id. at 830, 103 S.Ct. at 3356–57, and that the statute does not "forbid[...] conspiracies against workers who refuse to join a union" (id. at 835, 103 S.Ct. at 3359), where the acts

of the conspirators rest on "economic motivations" (id. at 839, 103 S.Ct. at 3361).

On appeal, Harrison contends, first, that the aim of the alleged conspiracy was to influence in a negative way the election of a Republican to a public office in the Commonwealth of Virginia and therefore state interests were affected sufficiently to establish a cause of action. Second, Harrison argues that the district court, in its interpretation of the *Scott* decision, also held by implication that Harrison was not a member of a class protected by § 1985(3). Harrison claims that as a Republican he is a member of a protected class under § 1985(3) and that the district court committed reversible error in ruling to the contrary.

We now hold that Republicans in the context present here do not constitute a protected class under § 1985(3). As a result of our holding on this question, we need not reach the issue of whether the aim of the alleged conspiracy was to influence state activity to a degree sufficient to state a claim for relief under § 1985(3).

## II

Section 1985(3) states, in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The statute's roots are the Civil Rights Act of 1871, Ch. 22, § 2, 17 Stat. 13, known as the Ku Klux Klan Act. See *Griffin v.*

*Breckenridge,* 403 U.S. 88, 98–99, 91 S.Ct. 1790, 1796–97, 29 L.Ed.2d 338 (1971); *Dombrowski v. Dowling,* 459 F.2d 190, 193–94 (7th Cir.1972). The passage of the Ku Klux Klan Act was in response to widespread violence and acts of terror directed at blacks and their supporters in the postwar South. See Cong. Globe, 42nd Cong. 1st Sess. 245–48, 320–21, 369, 374, 428, 436 (1871). Violent resistance to the changes of the Reconstruction Era in many southern States, including the transition from a slave to a free society, was led by a coalition of some Southern Democrats and the Ku Klux Klan. The primary goal of this resistance was viewed by Congress as the dismantling of the system of reconstruction, as well as the dilution of political rights gained by blacks through the post-Civil War Constitutional Amendments. Id. at 517–519 (remarks of Rep. Shellabarger); 201 (remarks of Rep. Snyder). The result of the Klan's activities was to limit the degree to which reconstruction policy was successfully implemented. Id. at 196, 369, 384.

The majority in Congress believed the provisions of the Act were necessary in order to compensate for the inability or unwillingness of southern governments and state judges to stem the tide of violence:

> So, sir, it comes to this: by the united voice of this House, of gentlemen upon both sides of this House, these alleged outrages in the southern States do exist. Men are murdered; their property is burned or otherwise destroyed; they are scourged, and the local law is not administered so as to demonstrate its power to reach these offenses or to defend the citizens who are subject to them.

Id. at 392 (remarks of Rep. Smith); see id. at 72, 196, 368, 487. See also *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1334 (7th Cir.1977). This failure or inability on the part of local southern governments to control the Klan was particularly troubling to Republican Congress-

men. During this period, Republicans were leading supporters of the emancipation of blacks, and as a result frequently joined the blacks as common victims of Klan intimidation and violence. See Cong. Globe, supra, at 320–22, 391, 412–13. In addition, Republicans were disconcerted by the apparent alliance between the Klan and Southern Democrats, which Republicans viewed as a conspiracy to establish Democratic hegemony in the South. Id. at 78, 108, 252, 484, 504, 702. See, generally, Randall, *The Civil War and Reconstruction* (1937), esp. p. 854–858; Comment, *A Construction of Section 1985(c) in Light of Its Original Purpose,* 46 Univ. of Chi.L. Rev., 402 (1979); Note, *Federalism and Federal Questions: Protecting Civil Rights Under the Regime of Swift v. Tyson,* 70 Va.L.Rev. 267 (1984). A resume of Supreme Court decisions on the subject appears in *Novotny,* infra, 442 U.S. at p. 370, n. 7, 99 S.Ct. at p. 2348, n. 7.

Against this backdrop of political terrorism, Congress enacted § 1985(3), affording a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause, including Republicans. See *Carpenters v. Scott,* 463 U.S. at 836, 103 S.Ct. at 3359. However, while the statute originally grew from the conflict accompanying the freeing of blacks and the passage of the Thirteenth, Fourteenth and Fifteenth Amendments, its broad language has prompted some expansive interpretations in recent years. The result has been considerable controversy among the inferior federal courts over the reach of § 1985(3). See *Hobson v. Wilson,* 737 F.2d 1, 21 (D.C.Cir.1984). It is to this question which we now turn.

The starting point in our decision concerning the scope of protection provided by § 1985(3) must begin with the Supreme Court's landmark decision in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).[1] In *Griffin,* a group

---

**1.** Prior to the decision in *Griffin,* § 1985(3) had remained largely dormant, and the Supreme

Court had issued only two significant opinions interpreting the coverage of the statute since its

of blacks was assaulted by a group of whites while traveling on an interstate highway in Mississippi. The attack was carried out under the mistaken belief that the blacks were civil rights workers. The blacks filed an action for damages pursuant to § 1985(3). The issue before the Supreme Court was whether the coverage of § 1985(3) reached individuals acting in a purely private capacity. The Court held that the statute does create a cause of action for certain kinds of private action interfering with the federally protected rights to travel and Thirteenth Amendment rights, and enumerated the elements required for stating a complaint under § 1985(3):

> To come within the legislation a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another" (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immuni-

ties under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

*Griffin v. Breckenridge*, 403 U.S. at 102–03, 91 S.Ct. at 1798–99. While the *Griffin* decision was unanimous, the Court expressed considerable concern over the broad language of § 1985(3). The Court cautioned that although § 1985(3) was designed to reach private conspiracies, Congress did not intend for it to "apply to all tortious, conspiratorial interferences with the rights of others." *Griffin v. Breckenridge*, 403 U.S. at 101, 91 S.Ct. at 1798. See *Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 829 (7th Cir.1975).

In order to provide meaning to the intent of Congress, the Court in *Griffin* proceed-

---

enactment. In *United States v. Harris*, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), the Court held unconstitutional the criminal provisions of section 2 of the Ku Klux Klan Act, the counterpart to the civil remedies of § 1985(3). Specifically, the Court viewed the provisions as an attempt by Congress to acquire a general criminal jurisdiction for the federal courts. In maintaining that view, the Court construed the statute to be overbroad, and held that its passage exceeded the possible sources of Congressional authority, in particular the Thirteenth, Fourteenth and Fifteenth Amendments. Id. at 637–642, 1 S.Ct. at 607–12.

The Court's next notable pronouncement concerning § 1985(3) came 70 years later in *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). *Collins* involved the disruption of a political meeting of white citizens protesting the Marshall Plan, by another group of whites falsely wearing American Legion hats. The complaint alleged that the plaintiffs were members of a political club who had been deprived of their First and Fourteenth Amendment rights by violent, conspiratorial activities of the defendants. In concluding that the complaint did not state a cause of action under § 1985(3), the Court held that the complaint failed to make any allegations that the "conspiracy or the overt acts involved any action by state officials, or that the defendants even pretended to act under color of state law." Id. at 655. The Court further reasoned that

What we have here is not a conspiracy to affect in any way these plaintiffs' equality of protection by the law, or the equality of privileges and immunities under the law. There is not the slightest allegation that defendants were conscious of or trying to influence the law, or were endeavoring to obstruct or interfere with it. The only inequality suggested is that the defendants broke up plaintiffs' meeting and did not break up meetings of others with whose sentiments they agreed.... Such private discrimination is not inequality before the law unless there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so. Id. at 661.

The Court in *Collins* avoided resolving any constitutional questions on the scope of § 1985(3), instead choosing to find that the facts before it did not satisfy required elements of the statute's language. However, the opinion has been read as holding that state action is a necessary element for stating a cause of action under § 1985(3). See, e.g., *Collins v. Hardyman*, 341 U.S. at 663, 71 S.Ct. at 942 (Justice Burton dissenting); *Novotny*, infra, 442 U.S. at p. 371, 99 S.Ct. p. 2348.

In any event, the Court in *Griffin* did not adopt that analysis of *Collins*, and we need not now concern ourselves with that decision. See *Griffin v. Breckenridge*, 403 U.S. at 95–96, 91 S.Ct. at 1794–95.

ed to define the second requirement for stating a claim under § 1985(3):

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators action. The conspiracy in other words must aim at a deprivation of the equal employment of rights secured to all.

*Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798 (emphasis in original) (footnotes omitted). The Court in *Griffin,* presented with facts detailing a concerted, physical attack by whites upon suspected black civil rights workers, had little difficulty in finding that the complaint satisfied the second requirement. The Court noted that "the conduct here alleged lies so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private conduct that would come within the statute if this does not." Id. at 103, 91 S.Ct. at 1799. And the Court expressly chose to reserve the question of whether a conspiracy motivated by invidiously discriminatory animus other than racial bias would be actionable under § 1985(3). Id. at 102, n. 9, 91 S.Ct. at 1798, n. 9. In so choosing, however, the Court did not define the limits of the scope of protection provided by the second requirement for a § 1985(3) claim. It is this question which now confronts us.

In the years following *Griffin,* the federal courts on numerous occasions have been faced with the question of whether non-racially motivated discrimination was actionable under § 1985(3). The result has been a wide range of decisions exhibiting conflicting views on the kinds of class-based discriminatory animus which come within the reach of the statute. Various decisions of the courts of appeal have found non-racial classes deserving of § 1985(3) protection. See, e.g., *Hobson v. Wilson,* 737 F.2d 1, 21 (D.C.Cir.1984) (political affiliation with racial overtones); *Ward v. Connor,* 657 F.2d 45, 47–48 (4th Cir.1981) (members of Unification Church), cert. denied, 455 U.S. 907 (1982); *Hampton v. Hanrahan,*

600 F.2d 600, 623 & n. 22 (7th Cir.1979) (racial political organization, Black Panther Party), rev'd in one aspect not relevant here, and cert. denied otherwise, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Means v. Wilson,* 522 F.2d 833 (8th Cir. 1975) (Indian supporters of a political candidate), cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir. 1975) (opponents of a political figure, the President), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir. 1973) (members of the Jewish faith); *Cameron v. Brock,* 473 F.2d 608 (6th Cir.1973) (supporters of a political candidate); *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971) (en banc) (members of a predominately white Catholic parish).

In other decisions, however, those courts have not extended the protection of § 1985(3). See, e.g., *Wilhelm v. Continental Title Co.,* 720 F.2d 1173 (10th Cir.1983) (handicapped persons); *Taylor v. Brighton,* 616 F.2d 256 (6th Cir.1980) (employees who wished to file racial, labor, and OSHA complaints); *DeSantis v. Pacific Telephone and Telegraph Co.,* 608 F.2d 327 (9th Cir.1979) (homosexuals); *Carchman v. Korman Corp.,* 594 F.2d 354 (3rd Cir.1979) (tenant organizers), cert. denied, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *Lessman v. McCormick,* 591 F.2d 605 (10th Cir.1979) (debtors); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919 (5th Cir.1977) (en banc) (bankrupts); *Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir.1975) (female as faculty member), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Lopez v. Arrowhead Ranches,* 523 F.2d 924 (9th Cir. 1975) (citizens and legally admitted alien farm workers); *Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504 (4th Cir.1974) (Ku Klux Klan members); *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir.1972) (lawyer with criminal practice and minority clients).

In reviewing these decisions, it becomes apparent that despite those decisions which

have limited the scope of the statute, there exists support for the contention that Republicans constitute a class entitled to relief under § 1985(3). The argument is further bolstered by the frequent mention of Republicans as victims of Klan activity in the legislative history of the 1871 Act. Indeed, this position was adopted by the Second Circuit in *Keating v. Carey*, 706 F.2d 377, 380 (2d Cir.1983), in which the court directly held Republicans were a protected class for purposes of § 1985(3) in a case over the firing of one Keating who had been fired from State employment because of his political affiliation. Thus, the case law which has developed among the circuits since *Griffin* discloses some authority in support of the inclusion of Republicans as a protected class.

We do not believe, however, that such authority is persuasive. Rather, since the time those decisions which lend support to Harrison's claim were decided, including *Keating*, the Supreme Court has decided *United Brotherhood of Carpenters, etc. (Carpenters) v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). We find the language of *Scott* to be instructive on the issue before us.

In *Scott*, the Court considered the application of § 1985(3) to a conspiracy directed by a pro-union group against a group of non-union employees working for a non-union contractor. The conspiracy resulted in a physical attack upon the non-union workers, who subsequently brought an action for damages under § 1985(3). The district court found that such an attack evidenced a discriminatory animus against non-union workers as a class, and constituted an interference with the right of association, in violation of § 1985(3). On appeal, the Fifth Circuit, sitting en banc, affirmed the judgment of the district court holding that § 1985(3) reached conspiracies motivated either by political or economic bias. In reaching this result, the court of appeals reviewed the legislative history of the statute and concluded that § 1985(3) was originally intended to protect those punished by the Ku Klux Klan for their political association, particularly Southern Republicans and their supporters. The court then reasoned that the protection of § 1985(3) extended to political groups in general. Finally, the court of appeals concluded that the animus exhibited against an economic group, such as non-union workers, paralleled the animus against political association, and satisfied the class-based requirements of § 1985(3).

In reversing, the Court rejected as unpersuasive the position of the Fifth Circuit. Instead, the Court adopted the view that the original objective of the 1871 Civil Rights Act and § 1985(3) was the protection of blacks and their supporters in the South. The Court stated:

> In the first place, it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans. The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views toward the Negro.

*Carpenters v. Scott*, 463 U.S. at 836, 103 S.Ct. at 3359.

Even as it took this position, the Court acknowledged the portions of the legislative history which support the contention that Congress also intended to prohibit wholly non-racial, politically motivated conspiracies.[2] Id. at 836, 103 S.Ct. at 3359.

---

2. Specifically, the Court referred to the comments made by Senator Edmunds of Vermont in response to an inquiry concerning the breadth of the legislation:

> We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or a set of men against another to prevent one getting an indictment in the State

However, the Court found disconcerting the argument that § 1985(3) provides "a remedy for every concerted effort by one political group to nullify the influence or do injury to a competing group by use of otherwise unlawful means." Id. at 836, 103 S.Ct. at 3359. The Court reasoned:

> To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role which the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings. Id. at 836, 103 S.Ct. at 3359.

After reflecting on the absurd lengths to which such an expansion of § 1985(3) could be taken, the Court again recognized the statute's legislative history which evidenced some views that purely political association was to be protected. The Court took pains to point out, however, that it was aware of those same views in Griffin, and chose instead there to

> with[hold] judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here. Id. at 837, 103 S.Ct. 3360.

In analyzing the Scott decision, we find little support for the contention that § 1985(3) includes in its scope of protection the victims of purely political conspiracies. Indeed, the opinion in Scott exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court. Wilhelm v. Continental Title Co., 720 F.2d at 1176. Since the Court in Griffin provided blacks a remedy under § 1985(3) against private conspiracies, no other group or class has achieved similar status. See, e.g., Great American Fed. S & L Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). As a result, the Court provided no authority on which to base the extension of § 1985(3) protection urged upon us here.

We recognize that in Keating v. Carey, 706 F.2d 377 (2d Cir.1983), the Second Circuit decided that Republicans were a protected class under the statute. However, as noted earlier, that decision was rendered prior to Scott. The court in Keating rested the decision primarily on that legislative history to § 1985(3) which discussed how Republicans and others were being victimized by the violent, political terrorism of the Ku Klux Klan. Keating v. Carey, 706 F.2d at 387–388. In reliance on such legislative history, it chose to read Congressional intention as including Republicans within the scope of § 1985(3).

We now conclude that such a view of Congress' intent is not justified. We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions. The Supreme Court in Scott placed significant emphasis on the specific groups and concerns which were involved in the post-Civil War struggle for civil rights. As a result, the Court signaled that any analysis of § 1985(3)

---

courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter ... then this section could reach it. Cong. Globe, 42nd Cong. 1st Sess. 567 (1871). See Carpenters v. Scott, 463 U.S. at 837, 103 S.Ct. at 3360.

Since Senator Edmunds was floor manager of the bill in the Senate, his views might ordinarily be accorded some weight. However, the Court in Scott cautioned against such deference, noting that "[t]he provision that is now § 1985(3) ... originated in the House [and] [t]he narrowing amendment, which changed § 1985(3) to its present form, was proposed, debated, and adopted there, and the Senate made only technical changes to the bill." Carpenters v. Scott, 463 U.S. at 837, 103 S.Ct. 3360.

must be influenced by the nature of the group or class involved. *Wilhelm v. Continental Title Co.*, 720 F.2d at 1177.

This is made apparent from language in *Scott*, quoted above and repeated here. The Court in *Scott* noted it had earlier been confronted with the same legislative history in *Griffin*, and chose there to withhold judgment on whether § 1985(3) "went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth and Fifteenth Amendments." *Carpenters v. Scott*, 463 U.S. at 837, 103 S.Ct. at 3360. Most importantly, however, the Court then added that "[l]acking other evidence of congressional intention, we follow the same course here." Id. at 837, 103 S.Ct. at 3360. The significance of the Court's determination in *Scott* that the evidence of congressional intent did not warrant a widening of the scope of protection under § 1985(3), beyond that previously afforded in *Griffin*, should not be ignored.

Even if we chose not to follow this view of § 1985(3), we remain unpersuaded that the plaintiff has alleged facts stating a cause of action subject to the remedy of § 1985(3). Harrison contends here, in essence, that the defendants successfully conspired to discharge him from employment as a result of his decision to seek public office as a Republican and that such conspiracy and resulting discharge amounted to a violation of his constitutional rights to vote, seek public office, and freely choose political association. While the alleged intent of the conspiracy may be true, Harrison fails to allege any facts indicating that defendants' actions kept him from exercising these rights. Indeed, Harrison did run for the public office he sought, and we fail to see how Harrison's termination could have prevented his decision to vote and run as a Republican unless Harrison himself chose to allow it.

What Harrison is truly seeking to assert here is a constitutional right to maintain private employment while running for public office. However, we have never recog-

nized such a right. Similarly, the Supreme Court has "never held that the right to any particular private employment is a 'right of national citizenship,' or derives from any other right created by the Constitution." *Great American Fed. S & L Assn. v. Novotny*, 442 U.S. 366, 380, 99 S.Ct. 2345, 2353, 60 L.Ed.2d 957 (1979) (Justice Powell concurring). As a result, we decline to hold that a § 1985(3) has created any substantive rights to private employment. "Section 1985(3) provides no substantive rights itself...." *Great American Fed. S & L Assn. v. Novotny*, 442 U.S. at 372, 99 S.Ct. at 2349.

We also agree with *McLellan v. Mississippi Power & Light Co.*, that § 1985(3) certainly extends no further than to provide redress to those persons who are deprived by others of legal rights by "independently unlawful conduct," 545 F.2d at 927, but we do not mean to imply that we agree with *McLellan's* statement that such unlawful conduct does create a cause of action. In the instant case, Harrison was employed at will and as such was subject to discharge at the will of his employer. Thus, the defendants were well within their own rights in discharging Harrison. Since Harrison alleges no unlawfulness in his discharge other than the claim under § 1985(3), he has no legal cause to complain of the injury. As Justice Brandeis noted in *Senn v. Tile Layers Protective Union*, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229 (1937), "[o]ne has no constitutional right to a 'remedy' against the lawful conduct of another." Id. at 483, 57 S.Ct. at 864. We see no indication that the Supreme Court will depart from this view. See *Griffin v. Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1798. In fact, the Court in *Scott* expressed uncertainty over whether even the use of unlawful conduct in the deprivation of rights necessarily calls for a remedy. The Court remarked: "[W]e find difficult the question of whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of *otherwise unlawful* means." *Carpenters v. Scott*, 463 U.S. at

836, 103 S.Ct. at 3359 (emphasis supplied). In light of this language, and the Court's previous declarations, we are unable to find that Harrison is entitled to a remedy under § 1985(3) for loss of private employment.

In sum, we are of opinion that Republicans as a class are not protected by § 1985(3) in their private affairs against otherwise lawful, private conduct, even though the conduct may be a conspiracy which has as its purpose the discouragement of the participation of a Republican in the affairs of his party. We believe the Court's opinion in *Scott* is sufficient reason for us to form an opposite conclusion than the Second Circuit did in *Keating*. Even if *Scott* does not suffice, as we think it does, we then respectfully disagree.

The judgment of the district court is AFFIRMED.[3]

---

**3.** We would reach the same conclusion for the same reasons if Harrison had been a Democrat discharged by Republican employers.