Richard E. BROWN et al.

v.

VILLANOVA UNIVERSITY et al.

Civ. A. No. 74–1711.

United States District Court,
E. D. Pennsylvania.

July 31, 1974.

Gordon & Kaufman, Philadelphia, Pa., for plaintiffs.

Raymond T. Cullen, Jr., Philadelphia, Pa., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

*Findings of Fact*

1. Plaintiffs are twelve former and present students of defendant Villanova University.

2. Defendants are Villanova University, a private, parochial institution of higher education located in Villanova, Pennsylvania; its President, the Rev. Edward J. McCarthy; Dr. James F. Duffy, Vice-President charge of student affairs; and other officers of Villanova University.

3. In early 1974, a group of students, including some of the plaintiffs, formed an organization to seek more protection for the rights of students and a greater voice for students in school affairs. The immediate catalyst for the formation of this organization, called the "Ad Hoc Committee", was the disciplinary action taken against certain students in January, 1974. The members of the Ad Hoc Committee complained that these students had been expelled or suspended without due process.

4. On April 6, 1974, there was a school event known as "Candidates Day", during which prospective candidates for admission to the school visited campus.

5. On that date, there are many visitors on campus, and many parties in various parts of campus, including students' residence halls.

6. In order to allow the candidates and their families inside the dormitories where they might live, Villanova's regular parietal (visitation) rules were suspended so that individuals of one sex could be in the residence, washroom, and hallway areas of the opposite sex until 9:00 p. m.

7. Under Villanova's parietal rules, students are allowed to remain in the lounge areas of the residence halls of the opposite sex until 3:00 a. m. on weekends.

8. On April 6, several students, including some of the plaintiffs, distributed throughout campus fliers inviting students to attend a rally in Sheehan Hall, a residence for women students at the University.

9. Approximately fifteen minutes before the special visitation hours were to elapse, numerous male students came to Sheehan Hall, entered the washroom and hallway areas, and began to distribute beer from kegs.

10. Alarmed by this influx of male visitors, the resident counselors of Sheehan Hall asked for the help of male counselors. The Assistant Dean of Men, Anthony Martin, soon appeared on the scene and ordered the males to leave.

11. By this time—approximately 9:30 p. m.—there were over a hundred males in all areas of Sheehan Hall. When Mr. Martin and his cohorts were not able to convince the men to leave Sheehan Hall the police were called in.

12. When the police arrived, they were met by a group of students at the door who locked arms to resist their entry, but as the police approached this human barrier it voluntarily disbanded. Various members of the police entered the building but the police eventually left without making any arrests.

13. This melee-party-rally lasted into the night, and it was only much later that the University's disciplinary officers were able to disband it.

344

14. The plaintiffs were present at this event. Plaintiff Richard E. Brown, the President of the Student Body, and a student of high academic standing, testified that he arrived at Sheehan Hall at approximately 10:00 p. m. and attempted to assist Dean Martin in clearing the building. Brown stated that he did lock arms as the result of peer pressure, but ended his resistance as soon as police approached. Plaintiff Brown testified that he was thanked by a police lieutenant for his assistance in clearing the building. As a result of the disturbance at Sheehan Hall 56 students—allegedly those who could be identified from photographs by Dean Martin and his assistants—were charged with insubordination and participation in an unauthorized mass demonstration. Ten minute hearings were set for these students, but upon protest of counsel during the first such hearing a new hearing process was established. This revised process provided for a factual determination by a panel to be composed of the Dean of the Villanova Law School, the Dean of the Faculty of Arts and Sciences, and the Dean of Men. Students were given the right to be represented by counsel, the right to cross-examine, and the right to present evidence at these hearings. They were fully notified of the subject matter of these hearings. The panel's factual findings were then transmitted to Dr. James Duffy, Vice-President in Charge of Student Affairs, who then assessed the penalties. Of the fifty-six students originally charged, 31 were punished. Of a total of seven students who were expelled, six are plaintiffs here. The remaining plaintiffs received sentences ranging from suspension from 12 months to suspension for 15 months.

15. Several of the named plaintiffs, including plaintiff's Brown and Pakuris were members of the Ad Hoc Committee, and this fact was known to the officials of Villanova. Dr. Duffy testified that his decision as to punishments was based totally on the findings of the hearing panel. But upon cross-examination it was revealed that he himself was involved in making certain decisions for the administration on the night of April 6, and that he had discussed the events of the night of April 6 with other Villanova officials. Dr. Duffy also testified that past records of the students played a role in determining what punishment they received.

16. The attitude of the President of the University, Rev. McCarthy, was hostile to the presence and activities of the Ad Hoc Committee. Rev. McCarthy testified at the hearing that he held the Ad Hoc Committee's speech and organizational activities responsible for an environment in which acts of violence and desecration could exist. Father McCarthy did not attempt to hide this attitude from his subordinates or the students.

17. Those students who were expelled have experienced extreme difficulty in attempting to gain admission to other universities. The expulsion of plaintiff Brown came too late to allow him to gain admission to a university for the semester beginning this August or September.

18. Plaintiffs who were suspended are experiencing and will experience a delay and disruption of their education and careers.

19. The expulsion and suspension of the plaintiffs will result in a blot upon their records which will inhibit them from pursuing their university-level education, graduate education, and careers.

CONCLUSIONS OF LAW

1. This Court does not have jurisdiction by reason of 42 U.S.C. § 1983. The action of the officials at Villanova University was not state action within the meaning of that section.

2. Jurisdiction over this action cannot be based on the diversity jurisdiction statute, 28 U.S.C. § 1332, since complete diversity is lacking.

3. Jurisdiction of this court over the action is properly based on 42 U.S.C. § 1985, in that there is a substantial probability that plaintiffs will show at trial that there was a conspiracy

among some of the defendants to deny plaintiffs rights which are guaranteed them under the constitution, and that such a conspiracy was based upon an invidiously discriminatory animus in that they were punished severely because they had exercised in the past and continued to exercise their first amendment rights through membership on the Ad Hoc Committee. Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Cameron v. Brock, 473 F.2d 608 (6th Cir. 1973); Richardson v. Miller, 446 F.2d 1247 (3rd Cir. 1971); Pendrell v. Chatham College, 370 F.Supp. 494 (W.D.Pa.1974); Bellamy v. Mason's Stores, Inc., 368 F.Supp. 1025 (E.D.Va. 1973).

4. Plaintiffs will suffer irreparable injury unless the imposition of their penalties is enjoined.