**Don BRITT**

v.

**Irvin SUCKLE, Braccy's Inc., James E. Brownlee and Brosco, Inc., d/b/a Sherman Foundry.**

**Civ. A. No. S–76–49–CA.**

United States District Court,
E. D. Texas,
Sherman Division.

May 11, 1978.

Jarvis, Grisham, Sanders, Emerson & Fry, Sherman, Tex., for plaintiff.

Kennedy, Minshew, Evans, Campbell & Cain, Sherman, Tex., for defendants.

## MEMORANDUM OPINION

Justice, District Judge.

The plaintiff brings this civil action under the second subsection of 42 U.S.C. § 1985, a part of the Ku Klux Klan Act of 1871, whose range has only been adumbrated by the few decisions seeking to construe it. The subsection reads in its entirety as follows:

\* \* \* \* \* \*

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict,

presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

\* \* \* \* \* \*

Plaintiff relies particularly on that part of § 1985(2), following the penultimate semicolon, which deals with impeding the due course of justice in any State or Territory. In its concluding subsection, § 1985 gives a remedy to "the party so injured or deprived" within the terms of the statute, i. e., "an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." Defendants have moved to dismiss the complaint as failing to state a claim under § 1985(2).

## I. FACTUAL ALLEGATIONS

Plaintiff Don Britt is an adult white male. At the time the events giving rise to this suit were set in motion, he was employed as a general unskilled laborer by defendant Sherman Foundry, a joint venture,[1] situated in Grayson County, Texas. The allegations in his complaint paint a very grim picture of life and work at the Sherman Foundry. Summarized, they are as follows: The great majority of non-supervisory employees are members of minority groups, mostly blacks, Chicanos, and Mexicans illegally in the United States, who are, in the main, uneducated and unskilled. Taking advantage of this situation, defendants pay these workers lower wages and fewer benefits than those drawn by the

---

1. The other defendants in the suit are two of the corporations comprising the joint venture, Braccy's Inc., and Brosco, Inc., and two individuals, Irwin Suckle and James Brownlee, who own the entire stock of Braccy's and Brosco, respectively. When acts of "defendants" are described herein, the concerted actions of Braccy's and Brosco's, by and through their respective agents, are embraced.

average employee in Grayson County, all the while requiring very arduous labor and maintaining substandard working conditions. Most significantly, according to plaintiff, the Sherman Foundry has pursued a concerted plan to avoid bearing the cost of any industrial accidents, even those caused by its own negligent maintenance of sub-standard working conditions.[2] In elaborating his complaint, the plaintiff asserts that the Sherman Foundry is a sweatshop, rife with intentional exploitation of a suppressed class of uneducated minority workers, who, for lack of other employment opportunities, are forced to work there, and who daily face the risk of grave uncompensated injury.

The instant case generates from an injury sustained by plaintiff Britt during the course of his employment at the Sherman Foundry. The plaintiff alleges that the injury was proximately caused by the Foundry's negligence. According to plaintiff, his injury occurred while he was lifting heavy metal blocks, some weighing between 150 and 200 pounds, in an area which was dark, muddy, and strewn with loose debris. All of these factors, plaintiff alleges, contributed to cause his foot to slip at a time when he was lifting an engine block, resulting in severe and permanent back injuries to him. Unable to do any more heavy lifting, plaintiff was allowed by the Foundry to continue working in a less strenuous area for a week or two, after which he was discharged as unfit for work.

The plaintiff asserts that prior to his discharge, he had been holding down a second, part-time job at Waddle Pattern Shop. After his dismissal, plaintiff alleges that, although suffering pain in his back, he was able to continue this additional job, which did not require heavy lifting. It is plaintiff's contention that, subsequent to his discharge from the Sherman Foundry, the facts which form the basis for this civil action began to unfold.[3] Plaintiff first consulted a physician, T. C. Lewis, M.D., concerning his back. After obtaining Dr. Lewis' professional opinion that the injury had occurred as a result of the above-described accident, plaintiff sought the advice of the law firm of Brown & Hill on obtaining workmen's compensation benefits. Having learned of plaintiff's activities, defendants contacted Dr. Lewis to tell him they would not pay for plaintiff's medical treatment. They also communicated with Paul Brown, Esquire, of Brown & Hill, to urge him to drop plaintiff's case. Plaintiff was thereafter directed to his present attorney,[4] who filed Cause No. 89952, a negligence action, styled *Don Britt v. Sherman Foundry Co.*, in the District Court of Grayson County, Fifteenth Judicial District of Texas.

According to plaintiff, the defendants then contacted Thirn Waddle of Waddle Pattern Shop, and successfully persuaded him to discharge plaintiff. When plaintiff evidenced determination to continue his litigation by noticing the deposition of Messrs. Brownlee and Suckle, the Sherman Foundry, unexpectedly and without a statement of reasons, discharged plaintiff's daughter from her part-time employment at the foundry.[5] In addition, plaintiff alleges further unspecified acts taken by defendants to prevent plaintiff's being hired by any person or business in Grayson County.

## II. ANALYSIS AND CONCLUSIONS

### A. *Standards for Maintenance of Claim*

The gist of plaintiff's complaint is thus as follows: that to avoid bearing any of the financial burden for accidents at the Sher-

---

2. See Part II of this opinion, *infra*, for a description of the Sherman Foundry's legal obligations to its workers under the Texas Workmen's Compensation Act.

3. Plaintiff originally sought to bring his negligence claim against the Sherman Foundry under this court's pendent jurisdiction; that claim has already been dismissed by this court's order of September 26, 1977.

4. Firm members of Brown & Hill told plaintiff that a conflict of interest prevented their representation of him.

5. Plaintiff's wife, Alice Britt, is still employed by the Sherman Foundry. She, unlike either plaintiff or their daughter, is a member of an employee union.

man Foundry, the defendants have conspired to prevent their employees from seeking vindication of their legal right to recover for injuries caused by the Foundry's negligence; and that, to effectuate their purpose of locking Sherman Foundry employees out of the state courts, the defendants have conspired to make an example of any individual who challenges their decision, illegal under state law, not to compensate workers for injuries caused by the employer's own negligence. Claiming to be a victim of the conspiracy, plaintiff here seeks to defeat the alleged invidious scheme under the federal prohibition against conspiracies to obstruct the due course of justice. This court concludes that, as alleged, defendants' acts constitute a violation of 42 U.S.C. § 1985(2).

■ The subsection in issue, 42 U.S.C. § 1985(2), derives from section 2 of the Civil Rights Act of 1871. The decision in this case must be guided by two decisions: *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977), the authoritative expositors of another part of the original section 2, the current subsection 3 of § 1985.[6]

In *Griffin*, the plaintiffs charged a conspiracy on the part of two white adult males who, mistakenly believing the black plaintiffs to be civil rights workers, allegedly detained, assaulted and injured plaintiffs, who were traveling on interstate highways. The complaint further alleged an intent on the part of defendants, who were acting purely as private citizens, to prevent plaintiffs and other black persons from seeking the equal protection of the laws, and from

enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Mississippi. *Griffin v. Breckenridge, supra*, 403 U.S. at 90–91, 91 S.Ct. 1790. After reviewing "all indicators—text, companion provisions, and legislative history—", *id.* at 101, 91 S.Ct. at 1798, the Court held that § 1985(3) clearly extended to private conspiracies. Expressing grave concern lest this holding be used to turn § 1985(3) into a "general federal tort law", *id.* at 102, 91 S.Ct. 1798, the Court, drawing mainly on legislative history, specified "invidiously discriminatory motivation", *id*, as a required element of a cause of action under § 1985(3), and further defined the requisite motivation in terms that have since become formulaic in § 1985(3) litigation: "The language regarding intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (Emphasis in original.)

Tracking the words of the statute, the court outlined the necessary components of a cause of action under § 1985(3): "To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another'; (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law.'" Further, the complaint must allege that "one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the

6. At the outset, defendants argue that plaintiff has failed to allege a conspiracy as a matter of law since the Sherman Foundry is a single business entity which cannot conspire with itself. *Nelson Radio and Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972); *Cole v. University of Hartford*, 391 F.Supp. 888 (D.Conn.1975). Plaintiff counters that the Sherman Foundry is a joint venture, composed of several entirely separate and distinct corporations. Two of those corporations, and their principal owners, are defendants in this suit, and are alleged to have perpetrated the con-

spiracy in the course of operating the Foundry. All the cases cited by the defendants deal with the legal impossibility of a single corporation's conspiring with itself. The court is of the opinion that the joint venture status of the Sherman Foundry distinguishes the case considerably. Plaintiff should be given the opportunity to attempt to prove at trial that the independence of the joint venturers from one another, in other words, their calculated failure to merge into a single entity, in fact makes a conspiracy among them possible. *Cf. Rackin v. Univ. of Pa.*, 386 F.Supp. 992, 1005–1006 (E.D.Pa.1974).

object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'" *Id.* at 102–103, 91 S.Ct. at 1798. The Court held the complaint in *Griffin* sufficient to satisfy these statutory requirements, and to state a cause of action under § 1985(3).

Finally, the Court addressed the question of the constitutionality of § 1985(3), in terms of the extent of Congress' authority under the Constitution to prohibit private conspiracies. Adopting a liberal severability rule, the Court limited its inquiry to "identifying a source of congressional power to reach the private conspiracy alleged by the complaint *in this case.*" *Id.* at 104, 91 S.Ct. at 1799. (Emphasis added.) The Court proceeded to find that such power clearly existed under section 2 of the thirteenth amendment and the right of interstate travel, both of which are absolute guarantees rather than protection only against governmental interference. In pursuance of this rationale, the Court upheld application of § 1985(3) to the complaint before it as a constitutional exercise of Congressional power.

The most careful and sustained consideration of § 1985(3) by the Court of Appeals for the Fifth Circuit since *Griffin* is contained in *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919 (5th Cir. 1977) (*en banc*). In the course of dismissing the complaint of an employee discharged from private employment solely because he had filed a voluntary petition in bankruptcy, the Court of Appeals held that in order to state a claim under § 1985(3), the alleged acts of the defendants must be illegal, *independently* of § 1985(3). "Put more simply, there can only be a deprivation of the rights of a plaintiff when the action of the defendants is *otherwise* illegal." *Id.* at 925.

(Emphasis in original.) The court arrived at the requirement for independent illegality by looking at the language of § 1985(3) dealing with "equal protection of the laws," and concluding that private persons, as opposed to government officials, can deprive others of equal protection of the laws *only* by violating a law already in existence.[7]

Together, therefore, *Griffin* and *McLellan* provide the following general standards to test the sufficiency of plaintiff Britt's allegations:

(1) Statutory requirements:

(a) Has plaintiff alleged that defendants' actions are illegal independently of § 1985, as required by *McLellan v. Mississippi Power & Light Company, supra*?

(b) Has plaintiff alleged the "class-based animus" required of § 1985 (3) claimants by the Supreme Court in *Griffin v. Breckenridge, supra*?

(2) Constitutional requirement:

Does Congress have constitutional authority to reach and prohibit the private conduct complained of in plaintiff's complaint?

B. *The Independent Illegality Requirement*

As already mentioned, the Court in *McLellan* was interpreting § 1985(3) rather than § 1985(2), the latter being the subsection of the statute invoked by plaintiff in this case. A necessary preliminary question is, therefore, whether the independent illegality requirement is applicable to § 1985(2).

■ Although the difference between the language and structure of § 1985(2) and that of § 1985(3) suggests that independent illegality might not be a prerequisite for a § 1985(2) conspiracy,[8] the *McLellan* require-

---

**7.** The court relied for this conclusion on an alternative holding in *U. S. v. Harris,* 106 U.S. 629, 643, 1 S.Ct. 601, 27 L.Ed. 290 (1883).

**8.** The two subsections contain very similar language; the key phrase of § 1985(3), "equal

protection of the laws" also appears twice in the relevant part of § 1985(2). Yet the equal protection language plays a very different role in § 1985(2). Under § 1985(2), the conspiracy is actionable when it is "*for the purpose of impeding . . . the due course of justice in*

ment is so clearly met in this case as to make close inquiry into its applicability superfluous.

If plaintiff's allegations are proved, defendants' acts will constitute a violation of the Texas Workmen's Compensation Act, Tex.Rev.Civ.Stat.Ann. art. 8307c (Vernon Supp. 1976–1977), which reads as follows:

No person may discharge or in any other manner discriminate against any employee because the employee has in good faith filed a claim, hired a lawyer to represent him in a claim, instituted, or caused to be instituted, in good faith, *any proceeding under the Texas Workmen's Compensation Act,* or has testified or is about to testify in any such proceeding. (Emphasis added.)

Defendants argue that art. 8307c is irrelevant to the case, and that if they did discharge and harass plaintiff as a result of his suit against them, these actions were perfectly legal, since Britt's claim was a negligence action rather than an administrative claim for workmen's compensation

benefits before the Industrial Accident Board. However, the Texas Workmen's Compensation scheme, viewed as a whole, refutes this argument.

■ Employers in Texas have two options: they can choose to subscribe or not to subscribe under the Workmen's Compensation Act. In instances where employers subscribe, the injured workers may obtain only the workmen's compensation benefits set out in the Act. But as to employers who opt not to subscribe, the Workmen's Compensation Act [9] provides that their employees may bring negligence actions against them, and that in such actions, non-subscribing employers will not be allowed to avail themselves of any of the following common law defenses: contributory negligence, the fellow servant rule, or assumption of risk. *See* §§ 1 and 4. Although defendants choose to characterize such an action as a common law action, nonetheless, it is completely provided for and described in the Workmen's Compensation Act:

---

any state . . ." and if there is *intent* either (1) "*to deny to any citizen the equal protection of the laws,* or (2) to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person or class of persons to the equal protection of the laws." Section 1985(3), on the other hand, makes the conspiracy actionable when it is "for the *purpose* of depriving . . . *any person or class of persons of the equal protection of the laws.*" (Emphasis added.) In other words, § 1985(3) deals with conspiracies the *purpose* of which is to deprive citizens of equal protection of the laws, whereas § 1985(2) deals with conspiracies, the *purpose of which is to obstruct the due course of justice.*

It follows that the predicate for the Court's independent illegality requirement in *McLellan,* —the necessity for a law protecting a plaintiff before he can be the victim of a conspiracy for the purpose of depriving him of the *equal* protection of that law—is not present in § 1985(2). On the surface, this distinction between purpose and intent may seem overdrawn, since in ordinary, modern usage, the words have very similar meanings. The distinction drawn here, however, is not based on any theory that the words in themselves have different meanings, but rather that they are used in the statute in different ways. "Purpose" is used three times in subsections (2) and (3) and appears to designate the main object of the conspiracy prohibited. "Intent" is used once, and only in conjunc-

tion with a conspiracy, the "purpose" of which has already been identified.

This court reads § 1985(2) to deal particularly with conspiracies to prevent equal access to state courts. Access to state courts becomes an issue only when there is already some underlying legal claim, such as plaintiff Britt's negligence claim under state law in this case. If *McLellan* is grafted into § 1985(2), it means that before a claimant has a federal cause of action for obstruction of justice, state law must not only give him a legal right, but also the right to judicially enforce that right. This seems unreasonable when the words of § 1985(2) themselves appear to confer the right of unfettered enforcement. In other words, the *McLellan* requirement would allow § 1985(2) to operate only as an alternative federal remedy, and only when there is a parallel statute such as Article 8307c in this case under state law. While § 1985(3) may be plausibly read this way, the part of § 1985(2) relied on here appears clearly to confer a substantive right to be free from conspiracies formed to keep certain classes of persons out of state courts, just as another clause of § 1985(2) confers the right to be free from conspiracies created to intimidate federal court jurors or witnesses, regardless of whether such intimidation is illegal under state law.

9. See especially Article 8306, §§ 1, 3, 3a, and 4.

Sec. 4. [Employees of employers who] are not at the time of the injury subscribers . . . shall be entitled to bring suit and may recover judgment against such employers, or any of them, for all damages, sustained by reason of any personal injury received in the course of employment or by reason of death resulting from such injury, and the provisions of section 1 of this law shall be applied in all such actions.[10]

Also under the Act, the employee of a subscriber is deemed to have waived his right to a negligence action, unless he gives his employer written notice, at the time of his contract of hire, that he wishes to retain that right. The claim of an employee of a subscriber who has not waived this right, however, *is* subject to common law defenses. § 3a.

■ Therefore, the Texas Workmen's Compensation Act provides for three categories of claims: (1) administrative claims by employees of subscribers; (2) negligence actions by employees of nonsubscribers in which common law defenses *are not* available; and (3) negligence actions of employees of subscribers wherein common law defenses *are* available. All of these actions are clearly indicated by the words of art. 8307c, "any proceeding under the Texas Workmen's Compensation Act."

■ Indeed, defendants' reading of art. 8307c would be illogical, even if the wording of the Act itself were less clear. The coerced waiver of common law defenses is obviously meant to encourage employers to subscribe to the insurance plan. The Legislature has dealt the cards very carefully, distributing benefits, risks, and forfeits with a particular balance of power between employer and employee in mind. And then, in order to lock in that balance, to ensure that the benefits dealt to the employees will not be circumvented by employers, the legislature has added art. 8307c, prohibiting retaliation against employees who seek to use the weapons afforded to them by the Act as a whole. Neither reason nor anything in the Act indicates that employers who choose to submit to negligence actions and waive their common law defenses should be given preferential treatment and allowed to discriminate against their employees. Indeed, the coercive aspects of the Act indicate that the Legislature intended to *penalize* nonsubscribers, not favor them. Therefore, the explicit words of the statute in question, as well as the plan implicit in the statutory scheme as a whole, compel the conclusion that art. 8307c prohibits the conduct of defendants alleged by plaintiff Britt. The independent illegality requirement of *McLellan* is thereby satisfied.[11]

### C. *The Requirement of a Class-based Animus*

In *Griffin v. Breckenridge, supra,* as already set out, the Supreme Court, after

---

10. Section 1 provides for the waiver of common law defenses and requires the plaintiff to prove negligence.

11. Defendants cite the case of *Lester v. County of Terry*, 353 F.Supp. 170 (W.D.Tex.1973), *aff'd*, 491 F.2d 975 (5th Cir. 1974), in support of their reading of art. 8307c. Although some language in the district court opinion does indeed lend such support, one crucial fact in the case, the fact that the defendant was a *county*, renders the case inapplicable. Under the Workmen's Compensation Act, a county's subscription to the insurance plan "is permissive and not mandatory." Art. 8309c § 3. Unless ordered to subscribe by the voters of the county, the county *does not* waive its common law defenses. Unlike private employers, county employers might plausibly be understood to receive favored treatment under the Act. Insofar as anything in the *Lester* court's reasoning conflicts with the analysis outlined in the above opinion, this court respectfully disagrees with it. It should also be noted that the Fifth Circuit's affirmance of *Lester* is on other grounds, and makes no mention of art. 8307. *Fernandez v. Reynolds Metals Company*, 384 F.Supp. 1281 (S.D.Tex.1974), is inapposite.

This court does, however, find guidance in the Texas Court of Civil Appeals' decision in *Texas Steel Company v. Douglas*, 533 S.W.2d 111 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n. r. e.) (not cited by defendants), in which the words "any proceeding under the Texas Workmen's Compensation Act" are construed very expansively in light of the purpose of the Act, *i. e.*, "to protect persons who are entitled to benefits under the Workmen's Compensation Law and to prevent them from being discharged by reason of taking steps to collect such benefits." *Id.* at 115.

considering "all indicators—text, companion provisions, and legislative history—", 403 U.S. at 101, 91 S.Ct. at 1798, for the first time interpreted § 1985 to cover private conspiracies. The same indicators, however, led the Court to conclude that Congress had not intended "to punish an assault and battery when committed by two or more persons within a State". *Id.* at 101–102, 91 S.Ct. at 1798, quoting Representative Cook, Cong.Globe, 42d Cong., 1st Sess. at 485 (1871). In seeking to impose some limits on § 1985(3) that would prevent it from being used as "a general federal tort law", 403 U.S. at 102, 91 S.Ct. at 1798, the court read the very general language of § 1985(3) through the filter of legislative history; a conspiracy "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law" was held to be restricted to those motivated by a class-based, rather than by merely a personal, animus.

In utilizing the *Griffin* criterion, then, the first question is whether the class-based animus requirement of § 1985(3) also applies to § 1985(2), the statute invoked in this case; and, if so, whether it is most appropriately applied exactly as in an action under § 1985(3) or in some more refined form adapted to the language and intent of § 1985(2).

Of the few courts which have considered § 1985(2) since *Griffin*, most have concluded, with little or no analysis, that its class-based animus requirement for claimants under § 1985(3) applies with full force to § 1985(2) claimants as well.[12] *See, e. g., Smith v. Yellow Freight System, Inc.,* 536 F.2d 1320 (10th Cir. 1976); *Hahn v. Sargent,* 523 F.2d 461 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47

L.Ed.2d 754 (1976); *Kelly v. Foreman,* 384 F.Supp. 1352 (S.D.Tex.1974); *Phillips v. Singletary,* 350 F.Supp. 297 (D.S.C.1972). Yet, the ease with which these cases adopt the *Griffin* criterion would seem inappropriate in this case.[13] That part of the *Griffin* opinion which announces the class-based animus requirement deals exclusively with statutory interpretation. The question addressed by Justice Stewart was whether Congress intended to reach private conspiracies, and, that preliminary question having been answered in the affirmative, which private conspiracies Congress intended to reach.[14] All three subsections of § 1985 appear to address private conspiracies of various kinds. For example, subsection (1) prohibits, *inter alia,* conspiracies "to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof." The part of subsection (3) relied on in *Griffin* prohibits conspiracies

> for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws.

As these two parts of § 1985 reveal, the prohibitions of the statute vary a great deal in degree of particularity, with the quoted parts of subsections (1) and (3) representing the poles of specificity and generality, respectively. In short, the statute as a whole covers a wide range of private conspiracies, each subsection reflecting a different degree of precision respecting the conspiracies included within its terms. The class-based animus requirement of *Griffin* was imposed as an interpretation of the most general section. Consequently this court is hesitant to import the class-based animus requirement, unchanged, into § 1985(2). Rather,

---

**12.** One exception to this lack of attention to § 1985(2) is found in *Brawer v. Horowitz,* 535 F.2d 830 (3d Cir. 1976), in which the language and legislative history of the section are considered at some length.

**13.** Perhaps not much would have been gained in the § 1985(2) cases cited above from a more piercing analysis of the class-based animus requirement under § 1985(2), since none of the

complaints involved appears to have alleged even an arguably class-based animus.

**14.** To be sure, there is some discussion of the constitutional limits of Congress' power in this part of the opinion; but it, too, is included to clarify the congressional intent behind the statute.

so as to fit the dissimilar language of § 1985(2), the statutory requirements imposed by *Griffin* for § 1985(3) claimants should be tailored appropriately.

As has been pointed out above,[15] the conspiracies prohibited in the pertinent part of § 1985(2) are those of which the *purpose* is to obstruct the due course of justice, while § 1985(3) is directed toward conspiracies, the *purpose* of which is to deprive persons of equal protection of the laws or of equal privileges and immunities under the laws. Even taking into account the inevitable inclination toward judicial solipsism, it is clear that the term "due course of justice" has to do with courts and judicial enforcement of rights. Hence, when the purport of this phrase is compared to the more amorphous concept of "equal protection of the laws" or "equal privileges and immunities under the laws", it borders upon preciseness.

Apparently, the only case in which a complaint has been held to state a cause of action under § 1985(2) is *Mullarkey v. Borglum,* 323 F.Supp. 1218 (S.D.N.Y.1970). Although decided before *Griffin,* and its class-based animus requirement, and although the facts are not precisely parallel to those alleged here, *Mullarkey* buttresses the conception of § 1985(2) expressed above. There, the plaintiff tenants and members of tenant organizations sued a landlord, a building superintendent, and the District Attorney for using the state courts to retaliate against them for their tenant-organizing activities. "[T]he complaint allege[d] that the landlord conspired with others to drive the other tenant plaintiffs from the Defendant Borglum's rent-controlled premises . . . in violation of their rights to equal protection of New York's Rent Control Laws . . . ." *Id.* at 1228. In *Serzysko v. Chase Manhattan Bank,* 461 F.2d 699 (2d Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972), another indication appears that § 1985(2) should be inter-

preted to cover the facts in plaintiff's complaint. Serzysko, the plaintiff, sued Chase Manhattan Bank to recover damages resulting from violations of a Federal Reserve regulation. During the course of his litigation, he was allegedly approached by his employers, a brokerage house which did a substantial amount of business with Chase, in an effort to persuade him to discontinue his lawsuit. The Second Circuit held that the complaint was "suggestive of an action based upon 42 U.S.C. § 1985(2)," 461 F.2d at 703.

Two crucial distinctions between § 1985(3) and the above interpretation of § 1985(2) indicate different applications of the class-based animus requirement. First, viewed as dealing particularly with equal access to state courts, § 1985(2) has its own built-in limitations, for this section could not be read as the "general federal tort law" into which § 1985(3) threatens to expand.[16] Second, the class-based animus requirement of *Griffin* is a product of statutory interpretation. In *Griffin,* the court's construction of § 1985(3) centered on conspiracies broadly purposeful of deprivation of equal protection of the laws. When the purpose of the conspiracy is more precisely focused on the courts, as it is in § 1985(2), and the denial of equal protection is limited to a sphere of particular Congressional concern, then the content of the requisite animus must change also. An analogy is the traditional two-tiered analysis employed by the Supreme Court under the equal protection clause of the Constitution. *See San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Under this approach, if no particular fundamental right is threatened, ordinarily a suspect classification (for example, discrimination against a particular racial group) is required before a law is struck down. However, where a fundamental right is implicated, such as the right of free speech, all distinctions among

---

**15.** *See* note 8 *supra.*

**16.** It is instructive in this regard to consider how many of the cases brought under § 1985(3) could not even *plausibly* fit the language of

§ 1985(2). *See, e. g., Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976).

*classes,* whether or not traditionally discriminated against, require close judicial scrutiny. Correspondingly, in § 1985(3), where no right is specifically identified, the class-based animus must be along racial, or perhaps other analogous lines. The language of § 1985(2), conversely, by its heavy emphasis on access to the state's legal system, suggests the existence of invidious distinctions other than racial as denials of equal protection of the laws.[17]

This reading of § 1985(2) does not imply that the class-based animus requirement of *Griffin* can be dispensed with completely in § 1985(2) suits. For example, in one of the cases most commonly cited for the proposition that a class-based animus must be alleged in a § 1985(2) claim, *Phillips v. Singletary,* 350 F.Supp. 297 (D.S.C.1972), it can readily be seen that the complaint was deficient in this respect. Suing under § 1985(2), the plaintiff, who had been convicted of rape after pleading guilty, alleged that his attorney and the state prosecutor allowed him to tender his plea when they knew he was under the influence of drugs. The plaintiff evidently interpreted § 1985(2) as a general due process provision, and ignored the requirement of intent to deny equal protection of the laws. Thus, even assuming his allegations were true, nothing in his complaint indicated more than an individual lapse in the administration of justice, without the generality necessary for a deprivation of equal protection of the laws.

■ The required generality is clearly alleged in plaintiff Britt's case. To be sure, he is not a member of any class defined by some immutable trait such as race or sex, yet he is much more than an individual with a merely personal grievance: he is, according to his complaint, a member of a discrete class, which is composed of employees at the Sherman Foundry who are harassed and prevented from vindicating their right to workmen's compensation benefits in the state courts; further, defendants have singled out the members of the class for discriminatory treatment because of the specific type of litigation in which the class members desire to engage. In sum, defendants' intent, as alleged by plaintiff Britt, is to obstruct the due course of justice, the hearing and vindication of state claims of the affected class members in state courts; the defendants' discriminatory intent is not directed toward any personal or accidental characteristic, but is trained upon the nature of the claim sought to be heard and maintained. While this degree of generality might not suffice under § 1985(3),[18] it seems clear that, under § 1985(2), conspiracies to bar from state courts a class of plaintiffs defined by their desire to vindicate a particular right granted them by state law is sufficiently invidious to fall within the proscription of the section.

■ One additional aspect of this case demonstrates that the class-based animus requirement is fulfilled. This factor emerges from plaintiff's satisfaction of the independent illegality requirement of *McLellan.* The state's enactment of art. 8307c creates a *protected class,* which consists of workers who make claims against their employers for injuries suffered in the

17. This court does not mean to suggest that Congress can create a fundamental right out of whole cloth where the Constitution has not. The status of access to state courts in the constitutional scheme is discussed in Part III, *infra.* This part of the opinion deals only with the interpretation of Congress' words, and the fundamental right—suspect classification analysis is employed only to illustrate that equal protection of the laws requires differing behavior, depending on the circumstances.

18. There are however, many lower court cases in which the *Griffin* class-based animus requirement has been treated expansively enough to embrace such a class even under § 1985(3): *Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971) (white plaintiff fired because he had criticized employers' racially discriminatory policies held to state a § 1985(3) claim); *Pendrell v. Chatham College,* 386 F.Supp. 341 (W.D.Pa. 1974) (allegations of discrimination because of advocacy of the rights of a racial or otherwise class-based group held sufficient); *Brown v. Villanova University,* 378 F.Supp. 342 (E.D.Pa. 1974) (students who had exercised first amendment rights held to be sufficient class).

course of their employment.[19] Where state law has singled out this class as deserving of state protection, and defendants have sought to circumvent that protection, it is manifest that their conduct and motivation is invidious and class-based. It is likewise worthy of recall that workers have traditionally been thought of as a class, especially when their interests have conflicted with those of their employers. This discrimination against workers by employers, being a time-honored example of class-based discrimination, would seem plainly to fall within the language of *Griffin.*

### D. Congressional Power Under the Constitution to Reach Defendants' Alleged Conduct

The final question in this civil action arises once it is concluded that the alleged conspiracy falls within the language and meaning of § 1985(2). At this point, *Griffin* requires the identification of some provision of the Constitution which authorizes Congress to legislate regarding the private discrimination charged.

Finding a constitutional source of Congressional enactments is not a task peculiar to § 1985 claims. Nothing is more basic to our constitutional scheme than the principle that Congressional authority is that of enumerated powers, as contrasted to the more general powers of state legislatures. Every Congressional enactment must derive from one or another explicit constitutional grant of authority. The source of authority for § 1985 is generally thought to be section 5 of the fourteenth amendment.[20] Indeed, the act's original formal title was "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes." 17 Stat. 13.

However, relying upon the enforcement clause of the fourteenth amendment in this instance is problematical. The relevant substantive provision, section 1,[21] is a prohibition against *state* action, whereas § 1985 clearly attempts to govern private conspiracies. The Supreme Court has not yet authoritatively defined the degree and nature of state involvement required before Congress can regulate the conduct of private individuals pursuant to its power to ensure equal treatment by the state.

In *Griffin,* the Court sidestepped this problem. It looked beyond the source of congressional power the authors of § 1985 explicitly drew on; instead, the Court directed its attention to constitutional bases that Congress might have drawn on to prohibit the conduct alleged in the complaint. One such source was the thirteenth amendment, which is "not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States", *Griffin, supra,* 403 U.S. at 105, 91 S.Ct. at 1800 (quoting from the *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835). *See also Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). ". . . Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men." *Griffin, supra,* 403 U.S. at 105, 91 S.Ct. at 1800. A second source of constitutional power was identified as the

**19.** This fact alone sufficiently distinguishes the earlier case of *Jacobson v. Industrial Foundation of Permian Basin,* 456 F.2d 258 (5th Cir. 1972). At the time the complaint in that suit was dismissed, art. 8307c was not in force. Additional distinguishing circumstances are that plaintiff in *Jacobson* alleged a violation of § 1985(3) rather than § 1985(2), and the record in that case contained no support that his alleged class existed.

**20.** "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

**21.** "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

right of interstate travel, which is a guard against private as well as government interference. As a right and privilege of national citizenship, the "right to pass freely from state to state", *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 19, 53 L.Ed. 97 (1908), is "within the power of Congress to protect by appropriate legislation." *Griffin, supra,* 403 U.S. at 106, 91 S.Ct. at 1800. Since the allegations of the complaint left it "open to the petitioners to prove at trial that they had been engaging in interstate travel or intended to do so," *id.* at 106, 91 S.Ct. at 1800, the Court held that Congress had power to prohibit defendants' interference.

Justice Stewart concluded his opinion in *Griffin* with the following brief but provocative disclaimer: "In identifying these two constitutional sources of congressional power, we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment." *Id.* at 107, 91 S.Ct. at 1801, citing. *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *Oregon v. Mitchell,* 400 U.S. 112, 135, (opinion of Douglas, J.), 229, (opinion of Brennan, White, and Marshall, JJ.) 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *United States v. Guest,* 383 U.S. 745, 761, (Clark, J., concurring), 774, (Brennan, J., concurring and dissenting). 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

Certainly the easiest way to resolve the constitutionality of § 1985(2) would be to rely on the *Griffin* Court's citation of *Katzenbach v. Morgan, supra,* and the opinion of Justice Douglas in *Oregon v. Mitchell,* 400 U.S. 112, 135, 91 S.Ct. 260, 27 L.Ed.2d 272. In *Morgan,* the court upheld section 4(e) of the Voting Rights Act of 1965 as a proper exercise of congressional power under section 5 of the fourteenth amendment. The section provided that no person who had completed the sixth grade in a public school or accredited private school in Puerto Rico in which the language of instruction was other than English should be disenfranchised for inability to read or write English.

In interpreting the scope of congressional power under section 5, the Court deferred to Congressional determination of its own power and the necessity for its exercise first elaborated by Chief Justice Marshall in regard to the Necessary and Proper Clause. U. S. Constitution, Art. I § 8(18). *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819). "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," *Katzenbach v. Morgan, supra,* 384 U.S. at 651, 86 S.Ct. at 1723. Justice Douglas' opinion in *Oregon v. Mitchell, supra,* reiterates this position.

While *Morgan* still stands as a mandate of judicial deference in judicial review of legislation enacted under section 5, three factors militate against absolute deference in the instant case. The first is that, subsequent to *Morgan,* the Supreme Court struck down part of a Congressional enactment passed pursuant to section 5. *Oregon v. Mitchell, supra,* 400 U.S. 112, 91 S.Ct. 260. This very fact, accompanied by the self-conscious contraction of the broad language used in *Morgan,* indicates that legislation under section 5 is not, *per se,* constitutionally valid. Furthermore, the challenged law in *Morgan* was addressed to state action. The Act expanded fourteenth amendment coverage as to the content of equal protection, without enlarging the class of persons against whom the right to equal protection of the laws extended. Finally, while § 1985(2) is more specific than § 1985(3), it is hardly the precise, focused remedial provision upheld in *Morgan.* The case-by-case approach impliedly authorized by *Griffin* in effect allows the plaintiff to fill in the content of § 1985, thereby rendering complete deference to "the legislature" something of a misconception in this context.

The Court of Appeals for the Eighth Circuit has adopted a similarly broad approach to the constitutional question. In the case of *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971), the Court read the two opinions in

*United States v. Guest, supra,* cited by the *Griffin* Court, as requiring the conclusion that section 5 of the fourteenth amendment empowers Congress to prohibit private conspiracies that interfere with all fourteenth amendment rights. In these two opinions six of the Justices supported the proposition stated in *Guest* that ". . . there now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights." 383 U.S. at 762, 86 S.Ct. at 1180.[22]

This court's hesitancy to rest a conclusion of constitutional authority on the *Guest* opinion is twofold. First, although compositely joined by six of the Justices, the proposition relied on by the Eighth Circuit is not a holding; the Court in *Guest* found sufficient state involvement in the indictment in question to avoid facing the question head-on. Certainly the Court in *Griffin* did not appear to consider the question as having been authoritatively answered by *Guest.* Secondly, Justice Clark's language is deceptively simple. Although it initially appears straight-forward, the notion that private conspiracies can interfere with fourteenth amendment rights is deeply ambiguous. Professor Archibald Cox has pointed this out with characteristic clarity. The phrase, "fourteenth amendment rights," according to Professor Cox, "all too easily obscure[s] the critical correlation between duty and right . . . The only rights exactly correlative to the duties imposed by the fourteenth amendment are rights against the state, not against private individuals." The real question, purged of this latent ambiguity is, "whether Congress may grant statutory protection against private interference with the enjoyment of fourteenth amendment rights which has heretofore been applied only against state interference." Cox, *Foreword: Constitutional Adjudication and the Promotion of Human Rights,* 80 Harv.L.Rev. 91, 110 (1966).

Several lower courts have answered this question in the affirmative. Without addressing the problem explicitly or providing insight into their reasoning, they have sustained § 1985 complaints in cases where the only argument for congressional power was, that if a state had performed the alleged private conduct, such action would have violated the fourteenth amendment. *See, e. g., Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975) (private discrimination on the basis of sex held actionable under § 1985(3)); *accord, Stern v. Mass. Indemnity and Life Ins. Co.,* 365 F.Supp. 433 (E.D. Pa.1973); *Pendrell v. Chatham College,* 386 F.Supp. 341 (W.D.Pa.1974);[23] *see also Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir. 1973) (denial of employment benefits on the basis of religion and national origin stated claim under § 1985(3)); *Brown v. Villanova Univ.,* 378 F.Supp. 342 (E.D.Pa.1974); *Cameron v. Brock,* 473 F.2d 608 (6th Cir. 1973). However correct the result in these cases might be, their lack of explication renders them of little use in answering the constitutional question in this case.

In summary, a variety of authorities, including Supreme Court decisions, appears to support and encourage this court's conclusion of constitutional authority for Congress to regulate conduct such as that alleged against defendants in this case. *Griffin* itself, the principal guiding light for this case, adopts a rather generous attitude toward the inquiry relating to the constitutional source of the power exercised by Congress. With regard to the breadth of section 5 power, the Court, 403 U.S. at 107,

**22.** The quoted language appears in the concurring opinion of Justice Clark, speaking for himself, and Justices Black and Fortas. The identical principle is expressed in the opinion of Justice Brennan, speaking for himself, the Chief Justice and Justice Douglas. *Id.* at 782–784, 86 S.Ct. at 1191.

**23.** Although sex discrimination fits the "class-based animus" requirement more nearly than

discrimination on the basis of political views or attempts to utilize the state courts, it is no less problematic in terms of constitutional power. Victims of sex discrimination cannot fall back on the thirteenth amendment, as victims of racial discrimination may, and are thus in the same boat with all others asserting fourteenth amendment claims against private discrimination.

91 S.Ct. 1790, cites only opinions which support such authority. Despite the plenitude of partial support, however, this court does not feel justified in concluding, as did the Eighth Circuit in *Action,* that the question has already been satisfactorily answered, and chooses rather to try to make its own case for the constitutionality of § 1985(2) with regard to the facts of the instant case.

The key to this analysis is two Seventh Circuit cases which might initially appear to decide the issue adversely to plaintiffs: *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972); and *Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976). In *Dombrowski,* a successful criminal lawyer sued a real estate corporation for refusing to rent him offices in a building in which other lawyers were allowed as tenants. The trial court accepted the defendants' contention that their refusal was generated from fear of the security risk involved in having the plaintiff's clients in the building. Applying equal protection doctrine to the private defendants as if they had acted under color of law, the trial court found the exclusion of criminal lawyers arbitrary and entered summary judgment for plaintiffs under § 1985(3). The Court of Appeals reversed this holding. Assuming that the discrimination was in fact arbitrary (in other words, that if practiced by the state, such discrimination would violate the equal protection clause), Justice (then Judge) Stevens held that, as practiced by private persons, such discrimination did not deny plaintiff equal protection of the laws. He attempted to correct the erroneous assumption that, under *Griffin,* a § 1985(3) complaint need never allege state involvement, by identifying

two types of state involvement. The first, action "under color of law", is peculiar to § 1983 claims; such action describes the conduct and identity of the defendants, and is not a prerequisite under § 1985(3). The second type of state involvement speaks to the "nature of the plaintiff's rights" asserted. *Dombrowski, supra,* 459 F.2d at 194. Purely apart from the color of state law requirement of § 1983, some "rights" are only protected from state infringement, others from private interference as well. While thirteenth amendment rights and the right to national privileges and immunities, such as the right to interstate travel, can be protected against purely private conduct, rights protected by the fourteenth amendment, by their very nature rights against the state, require some state involvement. The *Dombrowski* analysis was reaffirmed three years later in another opinion by Justice Stevens, *Cohen, supra,* in which sex-based discrimination by a private university was held to be outside the realm of § 1985(3).[24]

*Dombrowski's* breakdown of the rights assertable under § 1985 provides this court with a constitutional source for upholding the instant complaint short of embracing the undifferentiated approach of the Eighth Circuit in *Action.* There is in this case, unlike in *Dombrowski* or *Cohen,* adequate state involvement to generate a genuine fourteenth amendment right in plaintiff Britt. To be sure, there is no action under color of state law; no stretch of imagination could frame a § 1983 claim out of defendants' conduct. But in the very core of § 1985(2), its concern with equal access to state courts, this court finds sufficient state involvement to justify congressional power

---

24. A section of the opinion in *Cohen* entitled "Order", following the main body of the opinion, states that the analysis described above dealt not with constitutional power but only with interpreting the language of § 1985(3): "The analysis . . . assumed for the purpose of decision the [sic] Congress has ample power to enact a statute having the coverage urged by petitioner but concluded that § 1985(3) is not such a statute." 524 F.2d at 830. As an interpretation of 1985(3), a statute which largely tracks the language of the four-

teenth amendment, the discussion is of little guidance to the more specific language of § 1985(2), especially since, as will be shown, the state involvement requirement is spelled out more clearly in § 1985(2). Nevertheless, despite its disclaimer as such, Justice Stevens' analysis seems to this court the best judicial discussion available of the question whether § 5 of the fourteenth amendment empowers Congress to regulate private action. See Cox, *Foreword, supra,* for a similar analysis.

under section 5 of the fourteenth amendment.

State courts have a manifold obligation to deal impartially with litigants. State courts cannot themselves decide arbitrarily or with invidious motives that certain causes of action granted by the Legislature (actions for negligence by injured workers against their employers, for example) will be barred from the courts and denied judicial enforcement. Certainly a plaintiff in such an action would have a state-created right against the state court's refusal to adjudicate his claim; but he would also have a twofold federal right to such adjudication.

First, the judicial branch of the state, like the legislative and executive branches, has an obligation to afford litigants equal protection of the laws. *See Mitchum v. Foster*, 407 U.S. 225, 240, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (quoting *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1879)). The equal protection guarantee precludes arbitrary or invidious discrimination against a particular class of litigants. *Cf. Lindsey v. Normet*, 405 U.S. 56, 74–79, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (discrimination against special class of appellants, *i. e.*, losers in Forcible Entry and Wrongful Detainer actions, by imposition of a double bond requirement, held arbitrary and irrational, thus violative of the equal protection clause).

Secondly, and more fundamentally, adjudication of state-granted rights is implicit in the whole constitutional scheme. As Chief Justice Marshall observed: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). The constitutional importance of access to courts has been repeatedly extolled in a variety of contexts, and attributed to a number of specific provisions. *See, e. g., Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *California Motor Transport Co. v.*

*Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *State of North Carolina v. Smith*, 501 F.2d 613, 615 (4th Cir. 1974); *Sexton v. Barry*, 233 F.2d 220, 224 (6th Cir. 1956); *Thompson v. Bond*, 421 F.Supp. 878 (W.D.Mo.1976); *Stover v. Carlson*, 413 F.Supp. 718, 722 (D.Conn.1976).

The state's obligation to adjudicate state claims with an equal hand thus derives from the state's relationship with the federal government, and from the individual's relationship with the federal government as well. A solid line of cases holds that a duty on the part of a governmental agency necessarily implies a corresponding right on the part of persons whom that duty protects, and that this right includes a guarantee against private interference with that right. For example, in *Logan v. U. S.*, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), the Court upheld the validity of the prosecution of a private conspiracy to injure a prisoner in the custody of a U. S. Marshal. The duty of the government to protect persons in its custody "necessarily implies a corresponding right of the prisoners to be so protected." This right of the prisoners to protection from private conspiracies, deriving from their right against the federal marshal himself, was held to be "a right secured to them by the Constitution and laws of the United States." *Id.* at 284, 12 S.Ct. at 623. Similarly, in *U. S. v. Waddell*, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884), the Supreme Court upheld a federal indictment alleging a private conspiracy to drive away a settler from a quarter section of land he was attempting to homestead, since his homestead claim was against the federal government. *See also Brewer v. Hoxie School District No. 46*, 238 F.2d 91 (8th Cir. 1956) (school board allowed to assert rights of school children to equal protection of the laws against private conspiracies to prevent desegregation).

E. *Conclusion*

█ In conclusion, the conspiracy alleged in this case is a private conspiracy, but its

purpose is to deny plaintiff equal treatment *by the state courts,* the means employed being the attempted denial of his access to them. The ultimate inequality of treatment in the courts, in Congress' language "the obstruction of the due course of justice," is the discrimination aimed at in the complaint and prohibited by § 1985(2). Whatever Congress' power to prohibit purely private persons from choosing not to associate with advocates of a particular cause or with members of one sex or political party, or to engage in any other conduct which is forbidden to the states, surely section 5 of the fourteenth amendment empowers Congress to prohibit private citizens from conspiring to prevent the state itself from performing its own duties under the Constitution.

In this court's view, the plaintiff has stated a claim under 42 U.S.C. § 1985(2). It follows that the defendants' motion to dismiss must be denied.